WALLING, Administrator of Wage and Hour Division, United States Department of Labor, v. WOODRUFF.

No. 93.

District Court, Middle District of Georgia, Columbus Division.

Sept. 2, 1942.

Geo. A. Downing, Regional Atty., A. B. Steed, Atty., T. T. Purdom, Asst. Atty., Wage & Hour Division, U. S. Department of Labor, all of Atlanta, Ga. (Warner W. Gardner, Sol., and Roy C. Frank, Asst. Sol., U. S. Department of Labor, both of Washington, D. C., on the brief), for plaintiff.

Emmett B. Cartledge, Jr., of Columbus, Ga., for defendant.

DEAVER, District Judge.

Defendant resides at Columbus, within the Middle District of Georgia.

Prior to and since October 24, 1938, defendant has been the sole owner of radio station WATL in Atlanta, Georgia, and has operated said station in that city under the name of Atlanta Broadcasting Company, under the license of the Federal Communications Commission.

Defendant in operating said station is engaged in interstate commerce.

In addition to station WATL, defendant operates two other radio stations, one at Albany, Georgia, and one at Columbus, Georgia. Defendant personally has practically nothing to do with the actual operation of these stations, but operates them through his son, J. W. Woodruff, Jr., who has general authority in the conduct of said business and acts in all respects for the owner. In connection with the Atlanta station J. W. Woodruff, Jr., has the title of Executive Manager. He resides in Columbus, Georgia, and is not regularly present at the Atlanta station, but visits said station at irregular intervals. J. W. Woodruff, Jr., as executive manager, employs a local or station manager who actually supervises the operation of the Atlanta station.

In addition to a clerical force, there are employed a staff of radio announcers under the immediate supervision of a program director, who is chief announcer, and engineers or technicians under the immediate supervision of a chief engineer.

From October 24, 1938, to December 18, 1940, the local manager directly in charge of active operation was Maurice C. Coleman. Succeeding him, James M. Comer, Jr., was local manager until January 1, 1942. After that date James A. Davenport has acted as local manager. For a time Ken Keese was program director and James E. Cox was personnel manager.

Neither the defendant nor his son, the executive manager, has had any personal contacts or negotiations with employees in regard to the employer-employee relationship, but relied upon the local manager to handle all those matters under instructions of the executive manager.

Those employees who were covered by the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., had, prior to the effective date of the act, been working for a stipulated weekly salary. Just before the effective date of the act, in order to bring said employees under the act on its effective date and to continue to pay them thereafter the same salary which they had been re-

ceiving, the executive manager, after conference with the local manager, prepared a schedule showing the number of hours per week to be worked by each employee. The hours to be worked by an employee within a week was arrived at as follows:

Take the number of hours the employee worked within a selected prior week and divide that number into the weekly salary, the quotient being the regular hourly rate. Next, multiply that rate by 44, the number of hours under the statute to be worked at the regular rate. Then, subtract the resultant figure from the weekly salary. Then, divide the remainder by the overtime rate, the quotient being the number of hours in excess of 44 which the employee could work and thus earn the exact amount of his salary.

For example, if an employee had been working 50 hours a week at a salary of $15 per week, his hourly rate would be 30 cents. Then, 44 hours at 30¢ would be $13.20. Subtract $13.20 from $15 and the remainder is $1.80. Then, divide $1.80 by 45¢, the overtime rate, and the result is 4 hours. That 4 hours added to 44 hours amounts to 48 hours per week. For such employee, therefore, the schedule would show that he was to work 48 hours per week for his salary of $15.

Each employee knew he was coming under the Fair Labor Standards Act and he knew what his salary was to be and he knew the number of hours he was to work for that salary. He must have understood, therefore, that his hourly rate was such as, under the act, would amount to his salary for the number of hours in his schedule. In the example above stated the employee would know that in order to earn exactly $15 in 48 hours under the act, his rate would have to be 30¢ for 44 hours and 45¢ for the remaining 4 hours.

It was understood between the employer and the employee that, if the employee worked fewer hours than called for by his schedule, he was nevertheless to be paid the amount of his salary and that, if he worked more hours than called for by his schedule, he was to be paid time and one-half for the hours in excess of the scheduled hours. The number of hours was placed in the schedule for the purpose of fixing the hourly rate and for the purpose of serving as an elastic standard of working hours, it being recognized that the actual hours would run sometimes more and sometimes less than the number in the schedule. That arrangement amounted to

the contract of employment. The executive manager turned the schedule over to the local manager and instructed him to put it into effect.

When the act went into effect the station continued to operate the same number of hours as before, namely, approximately 138 hours per week. No new employees were added immediately after the act became effective. The schedule called for a less number of hours for the employees to work than the estimated hours they had previously worked.

Each employee was instructed to keep his own time and was furnished with a time card on which he was to enter each day the hours he worked. Those cards were turned in to the bookkeeper and payment was made in accordance with the statute for all hours turned in. The schedule itself called for overtime hours in the sense that they exceeded the statutory work week of 44 hours, but pay for those overtime hours at time and one-half up to the number of hours in the schedule was included in the salary. The overtime complained of in this case is time worked in excess of the schedule hours.

Defendant, pursuant to the regulations of the Federal Communications Commission, kept a program log, which purports to show a continuous record of all the time the station was "on the air". The log was kept by the engineer on duty, who signed on and off when going on and off the air. The log covers each minute the station is operating. Though not required to do so, the log shows the name of the announcer who is "on the air" and for what periods of time. The log is not kept as a record of time for which employees are to be paid.

For more than two years after October, 1938, the executive manager signed blank checks, so that pay for overtime in excess of the schedule could be included by the local manager in the salary checks.

When employees turned in hours in excess of their schedules, they would be paid for it, but the executive manager would constantly write the local manager for explanations. Then, the local manager from time to time issued written instructions to the employees, two samples of which were put in evidence and, are as follows:
1. "WATL—Inter-Office Communication" "From Maurice C. Coleman at WATL.
     Date:   March 2, 1939.
"To Announcers:
"Under the Wages & Hours Act employees are to work forty-four hours a week.

and for all time over this time and a half will be paid. In order that some definite amount can be anticipated each week, Mr. Keese will post a schedule showing amount of overtime each announcer is to work. Under no circumstances is any announcer to work longer than the hours posted.

"It will be impossible for any announcer to exchange shifts with another announcer unless the exchange is again made in the same week so that the number of hours will not be disturbed. (Remember that our week here begins on Saturday and ends on Friday). We ask the cooperation of all to the extent that individual duties can be completed during the day's work hours.

"Maurice C. Coleman

"Please read and initial."

2. "WATL—Inter-Office Communication "From–Maurice C. Coleman, at WATL–. Date: Jan. 19, 1940.

"To Entire Staff: (Please read and initial)

"Re: Working Hours

"Under no circumstances is anyone to work overtime and not put it down on his time card. All hours worked *must* be entered on the card. This is in accordance to similar instructions issued some time ago.

"When overtime is necessary beyond the number of hours assigned per week, please request permission to work overtime and get overtime slip. Slips for the announcing department can be had from myself or Mr. Keese, for the technical staff, from myself or Mr. Comer. These slips should be turned in with the time card at the end of each week; otherwise, salary will not be paid for overtime.

"Maurice C. Coleman
(Slip attached)

"This permits ...... to engage in overtime work hours above regular schedule, to begin ...... and end ...... for the purpose of ...... Date ...... ...... Mgr."

These instructions were initialed by the employees, as directed.

Some employees complained at intervals to Coleman, Cox, Keese and possibly others in the station about this matter of hours beyond schedule, but they were given the impression that the executive manager did not like time in excess of the schedule and that nothing could be done about it. The idea became prevalent, among employees that, if they wanted to keep their jobs, they should not turn in much time over schedule even if worked. (Some of the employees testified that Cox and Keese actually told them not to turn in all the overtime hours they worked. That testimony cannot be accepted literally. Coleman was present at the trial. The witnesses did not testify that he instructed them to omit overtime. Cox is dead. Keese is doing army work for the government and was not available as a witness. Those witnesses were instructed by Coleman at one time not to work overtime. They were no doubt given the impression that too much overtime was not satisfactory to the executive manager. They probably took what was said to mean that it would be best not to turn in all the overtime and, so interpreting it, they testified as a fact to their construction of what was said.)

To keep the executive manager satisfied and, to avoid the necessity of making numerous explanations, the local manager and others in the station took it upon themselves, without the executive manager's knowledge, to make the impression upon the employees, without saying so, that even if they worked in excess of the schedule, it would be best not to turn in too much of it.

The correspondence between the executive manager and the local manager is not in evidence. The complaints, however, made by the executive manager covered a long period. Though some employees during that period kept on reporting overtime, the executive manager did not investigate to ascertain if the work could be done within the scheduled hours, but simply relied upon the local manager to keep the overtime hours as low as possible.

There is no definite evidence as to how much time in excess of the schedule was worked and not reported, but the program log shows numerous instances in which employees were on duty longer than the scheduled hours. The evidence indicates that there are probably some mistakes in the log but the number of instances of the kind referred to would not likely all be accounted for by mistakes. Moreover, some overtime hours, indefinite in number, not shown by the log, were worked and not reported. It is, therefore, found as a fact that some of the employees did put in time in excess of the schedule which was not reported. It is found also that the records to that extent were not accurate, since the time cards constituted the records of time which the defendant kept and relied upon.

Neither the defendant nor his executive manager knew of his own knowledge that the employees had failed to report all their hours. Nor does it appear that their attention was called to that fact, either by the employees or by the Wage and Hour Division before the suit was filed.

In addition to regular salaries, defendant has paid employees considerable amounts in bonuses.

Since the suit was filed, defendant has not only instructed the employees to turn in all the time worked but to do so daily. The executive manager has directed those in charge of the station to see that reports of time are made each day and to check by all means possible the accuracy of the time so reported.

If the correspondence between the executive manager and the local manager had been put in evidence, it might have thrown some light on the attitude of the executive manager and upon his motive in demanding explanations of overtime, but in the absence of such evidence, it must be found, from the evidence as a whole, that defendant and his executive manager have attempted in good faith to comply with the act, and that the failure to comply resulted from statements made by the local manager and others in charge of the station.

The court has jurisdiction of the parties and the subject-matter of the suit.

 Defendant has failed to comply with sections 6 and 7 of the act and with the regulation of the administrator requiring the keeping of proper records.

 An employer does not violate the act or the regulation by relying in good faith upon employees to keep and report their own time and by using the record so made as the record of time required by the regulation, if neither the employer nor his agents do or say anything to cause the employees to keep an incorrect record.

 When an employer does so rely upon the employees but some of his agents, contrary to his instructions, improperly influence employees not to report all their time, then, whether he would be liable to pay for the time not reported, it is not necessary to decide. But whether such employer should be enjoined or not depends upon whether in good faith he was attempting to comply with the act and upon what he has done to effect compliance since. he acquired knowledge of the improper conduct of his agents.

 The executive manager had a right to demand explanations as to the necessity for certain overtime hours, if he acted in good faith and not for the purpose of having time worked omitted.

 Congress intended that the Act should be complied with and provided, among other things, the remedy of injunction to require compliance. However, Congress did not intend that a court should issue an injunction where there has been a bona fide effort to comply and where the attitude of the employer has been cooperative and not antagonistic, and where injunction is not necessary and would have no value in securing future compliance.

Plaintiff is not entitled to an injunction.

Whereupon, it is ordered and adjudged that the prayer for injunction be and it is hereby denied.

It is further ordered that the cost of this case be taxed against the defendant.