James P. MITCHELL, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

KICKAPOO PRAIRIE BROADCASTING COMPANY, Inc., a corporation, and KLRS Broadcasting Company, a corporation, Defendants.

James P. MITCHELL, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

KICKAPOO PRAIRIE BROADCASTING COMPANY, Inc., a corporation, KLRS Broadcasting Company, a corporation, Neosho Broadcasting Company, Inc., a corporation, and Roger H. Taylor, Defendants.

Nos. 1594, 1597.

United States District Court
W. D. Missouri, S. D.
March 28, 1960.

580

Harper Barnes, Regional Atty., U. S. Dept. of Labor, John A. Weiss, Henry Mahlman, Attys., U. S. Dept. of Labor, Kansas City, Mo., for plaintiff.

Walker, Daniel, Clampett, Rittershouse & Ellis, Springfield, Mo., for defendants.

R. JASPER SMITH, District Judge.

In case No. 1594, the Secretary of Labor seeks to recover minimum and overtime wages due Hazel O. Waltman, a former employee of defendants, pursuant to the provisions of Section 16(c) of the Fair Labor Standards Act of 1938, as amended, Sections 201–219 of Title 29 U.S.C.A., hereinafter called the Act. In case No. 1597, the Secretary seeks to enjoin the defendant corporations and Roger H. Taylor from violating the provisions of Sections 15(a) (2) and (5) of the Act relative to overtime wages and record keeping. Since the evidence in case No. 1594 was considered pertinent in case No. 1597, the two actions were consolidated for trial

Defendants concede that their operations and their employees are under the Act and that they are subject to its provisions. It is also apparent with some very limited exceptions that no dispute exists between the parties as to the applicable principles of law involved. These cases therefore must be determined almost entirely upon their facts.

During the period of the alleged violations, from March 3, 1956, to the date of plaintiff's complaint on March 7, 1958, Kickapoo Prairie Broadcasting Company was engaged in the operation of Radio Stations under the call letters KLRS at Mountain Grove, Missouri, and KICK at Springfield, Missouri. In November or December of 1958, after the original complaint was filed, Kickapoo sold and transferred the Radio Station KLRS at Mountain Grove, Missouri, with its physical properties and assets, to KLRS Broadcasting Company, another Missouri corporation. The latter corporation was operating Station KLRS at the time of trial. The individual defendant, Roger H. Taylor, owned one-third of the stock of Kickapoo Prairie Broadcasting Company and was the secretary-treasurer of that concern during the years 1956 through 1958. He also owned one-third of the stock of the new corporation, KLRS Broadcasting Company, and was its secretary-treasurer.

Neosho Broadcasting Company was engaged in radio broadcasting at Neosho, Missouri, under the call letters KBTN. Mr. Taylor was the secretary-treasurer of that concern and owned stock during the years in question. At the pre-trial conference on March 19, 1959, it was noted that sale of this station to parties stranger to this action had been approved by the Federal Communications Commission and that transfer of ownership was then in progress.

Primarily, the controversy centers about the operation of Stations KLRS at Mountain Grove, Missouri, and KBTN at Neosho, Missouri. Except as hereinafter noted, no complaint is made by plaintiff concerning the operations of KICK at Springfield, Missouri. Defend-

ant Roger H. Taylor, together with two other individuals, Floyd W. Jones and Lester Strauss, owned the three corporations. In the initial phases of their operations it was agreed that the three principal stockholders and officers would rotate the supervision of payroll practices and operation of the stations at Neosho and Mountain Grove. This practice continued for a short time. However, in the latter part of 1956, Mr. Taylor assumed general control of the payroll practices of the two stations, and either approved or issued the payroll checks from that time forward.

During the period in question, time clocks were used for a very short time, but after protests and objections on the part of the various employees, they were removed. A system of time records was instituted by which each individual employee kept track of and made out his own time records. After the weekly time records were complete, the employee certified in writing on the time sheet that the record was accurate. It was then delivered to the Station Manager, who himself certified that the time record was accurate. After this it was forwarded to Mr. Taylor or to a Mrs. Martha Gibson whose offices were at Station KICK in Springfield, where the checks were prepared. Finally the checks with the time information were sent to Mr. Taylor's office for his approval and signature.

I

For consideration first is the claim of Mrs. Hazel O. Waltman. Mrs. Waltman, whose alleged overtime activity is the subject of case No. 1594, was first employed in March, 1956. She was employed on a regular full time basis on August 23, 1956, and continued in such a status until February, 1958.

There was testimony by Mrs. Waltman and by other former employees that she and they had worked in excess of the hours shown on their time cards for which they were not paid overtime. There was other testimony that they were informed not to report overtime but that nothing was said about not working overtime. All this testimony is sharply disputed. John Billingsley, Station Manager at Mountain Grove, and other witnesses testified that the various employees were instructed to "set their own hours" to the end that broadcasting services could be furnished within the hours the station was on the air, and, at the same time, avoid as much as possible working in excess of hours scheduled for the various employees.

Plaintiff and Mrs. Waltman place principal reliance on three day books or daily memoranda prepared by Mrs. Waltman and alleged by her to be a complete and accurate record of the hours worked by her from August, 1956, to February, 1958.

I have examined these time books carefully. Although it is alleged that they were kept on a daily basis, it is perfectly apparent from examining them that they were not so kept. Obviously, substantial blocks of them, covering weeks at a time, were completed at one sitting, and were not kept on a daily basis at all. Even if the other evidence in this claim was not contradictory and of questionable basis, there would be no way of approximating or estimating the exact number of hours claimed to have been worked by her.

These documents, taken in connection with the generally unsatisfactory and unimpressive testimony of Mrs. Waltman herself, force the conclusion that plaintiff has failed to sustain the burden of persuasion that exists in a proceeding of this character.

II

Only one complaint of consequence is made on the operation of Station KICK in Springfield. It relates to only one employee, Nova Nash. He was employed as News Editor from September, 1956, to July, 1957. He was paid a weekly salary of $90 without overtime payments, and no time record was kept on him.

Defendants contend that Nash was exempt as a professional employee under Title 29 U.S.C.A. § 213(a) (1). Plaintiff for the first time in its briefs

objects to consideration of the exempt status of Nash for the reason that it was not affirmatively pleaded in defendants' answers. It undoubtedly is true that this defensive matter normally is required to be pleaded and proved by defendants. However, counsel for defendants announced in opening statements as to Nova Nash that the defense would be that he was an exempt employee. Extensive evidence both direct and on cross-examination was introduced in the trial without objection. Within long established rules of procedure in this and other courts, plaintiff must be deemed to have waived the objection. The pleadings are considered amended to conform to the proof. Rule 15(b), F.R.Civ.P., 28 U.S.C.A.

The Administrator's interpretive regulations, 29 C.F.R., Sections 541.303(e) (f) (1) (2) (3) and 541.305(a) (b), describe general criteria to be considered in the definition of professional employee under the statute. The language of the regulations indicates the degree of uncertainty that exists in defining this area. News editors, reporters or rewrite men, as those terms are accepted and understood in the newspaper field, and as those occupations are defined by the Administrator are clearly not exempt occupations. And under the same general philosophy, reflected in the regulations, a radio announcer, even though his principal function is announcing news, would be in a non-exempt status.

■ However, the duties of witness Nash, as shown by the evidence, go quite clearly beyond the scope of the limitations imposed by the statute and by the regulations. Although he has the title of News Editor, he was actually in charge of the news department of Station KICK, he applied his special knowledge or talents with discretion and judgment; and he came within the category of a professional employee as that term is defined in the Act and in the regulations. Hence he was exempt. In this instance, defendants have sustained their burden of establishing their right to the exemption by a clear preponderance of the testimony.

### III

Plaintiff contends that defendants failed to pay overtime when employees worked overtime hours beyond that shown on their record, and that defendants failed to keep and maintain adequate records.

■ Darrell Hodges at Mountain Grove and certain other employees at Springfield and Neosho, received a so-called "talent fee" of $5 for reporting football and basketball games for time put in over and above their normal work week. No record of hours was kept. It is clear that in some instances at least, the $5 talent fee paid did not cover the minimum plus overtime requirement for the particular employee. The regulations, 29 C.F.R., Sections 550.1(a) (b) and 550.2, define and delimit the term "talent fees", as used in Title 29 U.S. C.A. § 207(d) (3) (c). Generally, this section and the regulation authorize payment of talent fees consisting of extra payments to employees having regular duties such as announcers or other employees as extra payment for services as a performer on a particular program or series of commercial programs. This fee is authorized when services performed on a program fall outside the regular workday or work week as established in good faith, if the special payment is actually sufficient in amount to include the statutory straight time and overtime compensation for the additional time worked.

■ This necessarily requires that records be kept of the time spent in this activity. To the extent that the $5 talent fee did not amount to at least the minimum plus overtime due that particular employee, and to the extent that records were not maintained, violations of the Act occurred.

It should be noted however, in this connection, that as soon as the attention of defendants was directed to this defect in their payment of wages, overtime and record keeping, immediate steps were made to correct it at all three locations.

Except for the talent fees as here mentioned, the evidence is insufficient to show violation at Mountain Grove and Springfield of provisions of the Act relating to overtime payments.

Witness Billingsley and the employees themselves testified that the employees were instructed to set their own hours. While it is clear that in that process they did not accurately record the precise hours worked, I am not persuaded that they in fact worked in excess of the total number of hours shown. For example, Mrs. Gambill testified that on occasions she worked until 5:30 or 6:00 P. M., when in fact her own time record showed that she worked until 5:00 P.M. The evidence is not persuasive that on a particular day or in a particular week when those instances occurred, she actually worked the number of hours shown on the time sheet plus additional time claimed in her testimony. There is other evidence that on occasions employees came to work at 10:00 A.M. or other hours while the time sheets showed earlier hours. I am of the view that Mrs. Gambill and other employees in similar categories at Mountain Grove paced themselves in conformity with instructions given them by witness Billingsley. By adjustments during the day the evidence indicates that they conformed their actual working hours to the maximum hours they were instructed to work.

A somewhat different situation is shown to have existed at Neosho. The policy of the controlling officers of the corporation was the same for Neosho as for the other establishments. The deficiency there resulted from improper and inadequate local management. As a matter of fact during a portion of the period in question there was no local manager at all, and the Station almost literally "ran itself" with skeleton supervision from the offices in Springfield. Basically, the difference in operation between Mountain Grove and Neosho stems from the fact that in Neosho a system of rigidly scheduled hours was worked out in advance. This was done in an effort to fit the flexible needs of operating the station within a normal work week for the different employees. These records of hours were followed so far as time schedule reporting was concerned, even though the hours actually worked were much more irregular and fluid. The amount of claimed overtime actually worked was not supported by persuasive testimony. In fact, there is some doubt that there was any substantial amount of actual overtime practiced for which no compensation was paid. However, some employees did put in time in excess of the schedule which was not reported. An artificial arbitrary assignment of hours was made. Although the employees certified as to those arbitrary hours, the evidence is clear that in their actual work, they did not conform to them, whether on regular time or overtime.

Aside from this general observation, there are certain specific matters to be noted.

John Prickett, for example, was paid on a 48-hour work week, $1 per hour for the first 40 hours and $1.25 per hour for the next 8 hours. This is an obvious violation of the overtime provisions of the Act.

Jerry Tertzakian was employed in a combined capacity of outside salesman and announcer. He was assigned certain arbitrary hours as an announcer. It was claimed by defendants that all other hours were spent by him in outside sales activity. The hours spent as an announcer are subject to the same criticism as is true of other employees at Neosho; i. e., that arbitrary hours were assigned and reported by the employee, when, in fact, although there may have been no overtime hours involved, the hours reported patently did not represent the hours employed.

In Mitchell v. Independent Stave Company, D.C.W.D.Mo.1958, 168 F.Supp. 830, we ruled that it is entirely proper for employees to be assigned to different kinds of work at different compensations. But the procedures for that type of employment must be met, and here they were not. Defendants have

not sustained their burden of showing an exempt status for Jerry Tertzakian.

## IV

Generally, except for certain specific violations mentioned here, evidence of violations of the Act demonstrates primarily questions of records of hours worked. The evidence is overwhelming that there was no deliberate falsification of hours worked, either by the local managers of the stations or by the operating officers themselves. The system used, calling for the employees to keep records of their own hours, after which that information was verified and certified by the local managers, was designed to be foolproof. Plaintiff's investigator conceded that the system was good and that with reasonable cooperation by the employees themselves, the system would have been subject to no question.

Plaintiff attempts by various devices and quotations from the testimony, to inject into this case major elements of deceit, and deliberate efforts to violate the Act as far as so-called "top management" is concerned. The inference is given that continued use of the same system of recording hours must be construed as deliberate defiance of the Act. No such conclusions are warranted or justified by the testimony. Rather, the conclusion is apparent that the operators were struggling at all times to come within the strict letter and spirit of the Act. The testimony of investigator Hurst who handled this case administratively, is particularly illuminating on this point.

Corrections in the manner of handling talent fees were made promptly. The managing officers frequently requested information as to a method of improving the system of record keeping. In each instance advice was given that the system was excellent but that the records were erroneous. At Neosho it is apparent that many of the evils connected with management-from-a-distance existed. Neosho becomes unimportant, however, on the question of an injunction, since it is no longer owned by the parties charged here.

The overall impression demonstrated by the testimony is that the operations at Mountain Grove and Neosho were small and informal, with a certain element of disregard by the employees of the technical aspects of the Wage and Hour Law. No employee at either station complained except for a discharged, disgruntled former employee, whose only complaint in the first instance was that she had not been given what she considered a two weeks severance pay.

 The system of record keeping is in conformity with standard and accepted accounting practices, but as it relates to a small business such as this one, it has several weaknesses. There is a tendency on the part of employees and employer alike to round off time to even numbers, regardless of whether or not they actually worked the precise times shown. And in an informal atmosphere there is an inclination to be careless. The difficulty inherent in keeping a precise record of daily time is common knowledge to anyone who has ever attempted to do so. Most people do not live on a rigid schedule, and only the most meticulous of individuals is able to keep track of time with regularity. To this extent a system of timekeeping by employees inevitably will result in daily irregularities and minor inaccuracies, regardless of the amount of time actually worked. To this extent, the result of a system such as is used here constitutes a technical violation of the Act. Violations existed, but the overall impression is that they were innocent violations. I am not prepared to indict the system to the extent that errors as shown here alone can constitute a basis for injunction, in the absence of more persuasive evidence of deliberate intentional violations of the Act. See Walling v. Woodruff, D.C.M.D.Ga.1942, 49 F.Supp. 52.

For the reasons given here, judgment will be entered for the defendants in Civil Action No. 1594. In Civil Action No. 1597 the request for injunction is denied and the action is dismissed. Judgment will be entered accordingly. It is so ordered.