Thomas R. SHERWOOD, et al., Plaintiffs,

v.

THE WASHINGTON POST, Defendant.

Civ. A. No. 86–2701.

United States District Court, District of Columbia.

Jan. 13, 1988.

Supplemental Order Jan. 15, 1988.

Robert E. Paul, Michael T. Leibig, Eugene R. Fidell, Washington, D.C., for plaintiffs.

John G. Kester, Michael S. Sundermeyer, William R. Murray, Jr., Eleni Constantine, Washington, D.C., for defendant.

## MEMORANDUM REGARDING REPORTERS/EDITORS

GESELL, District Judge.

Ninety-nine plaintiffs including reporters, editors or photographers presently employed by The Washington Post ("Post") have invoked Section 13(a)(1) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 213(a)(1) (1982), claiming they have been improperly denied time and a half pay for their overtime work. The Court has before it elaborately documented cross-motions for summary judgment limited to those plaintiffs who are reporters/editors. The motions concern whether or not members of this particular group of plaintiffs are exempt from the FLSA because they are professionals within the meaning of that Act. This issue has been fully briefed and argued.

### INTRODUCTION

The complaint, demanding jury trial for each plaintiff, was filed October 1, 1986. Although it presently combines 99 separate claims for relief under the FLSA, it does not purport to be, nor is it, in fact, a class action. After comments by the Court, it became apparent to counsel on both sides that some adjustments were necessary to fashion a suit that would bring the underlying legal issue into sharp focus. Plaintiffs dropped their demand for jury trial and agreed to defer damage claims pending resolution of their entitlement to time and a half pay for overtime work. It was then stipulated that depositions of individual plaintiffs, supplemented by more general discovery, would be limited to a representative group of 20, 10 to be selected by counsel on each side. The stipulation further provided that upon completion of discovery the overtime entitlement issues would be presented to the Court for resolution through separate cross-motions for summary judgment relating to reporters/editors and to photographers, respectively.

As a result of these arrangements a detailed record has been developed to support the motions. Thirteen reporter/editor

plaintiffs were deposed,[1] lengthy depositions were also taken from Benjamin Bradlee and Leonard Downie, Jr., the Executive Editor and the Managing Editor of the Post, respectively, and these depositions have been supplemented by affidavits and other relevant materials.

### THE ISSUE

Under longstanding practice, periodically re-examined in collectively bargained agreements, The Washington Post since 1945 has paid time and a half wages for overtime work to all reporters/editors earning a salary of less than a stated amount per week.[2] This complaint was filed after the last collectively bargained agreement failed to be renewed and negotiations for renewal had come to an apparent stalemate. There are 236 reporters and 160 editors who work full time out of the paper's Washington, D.C. newsroom. The approximately 60 reporters/editors who are plaintiffs earned an average of $50,000 per year with annual salaries ranging from $30,000 up to $60,000 at time of suit. Under the newspaper's system of compensation, few reporters/editors fall below the overtime cutoff wage and receive time and a half pay.

The FLSA provides an exemption from the Act's overtime pay requirements for employees working in a "bona fide executive, administrative or professional capacity." 29 U.S.C § 213(a)(1). The individual plaintiffs each deny he or she is a professional within the meaning of this overtime exemption. Since they frequently gather information, write or edit outside the paper's 9:00 a.m. to 6:00 p.m. hours, they seek to be paid time and a half wages for this work regardless of the amount of salary received or any arrangement included in a collectively bargained agreement.[3]

The Washington Post contends that all of its reporters/editors, including the plaintiffs, are professionals within the meaning of the FLSA and therefore are exempt from the Act's time and a half overtime pay requirement. More specifically, it urges that the reporter/editor plaintiffs should be recognized as journalistic writers whose principal duty is to develop and write "original and creative" material and that, as such, they must be treated as members of an artistic profession within the meaning of the Department of Labor regulations found at 29 C.F.R. § 541.303 (1987) and other relevant interpretations of the FLSA. The Post has the burden of proof on this issue.

Upon receiving the motion papers it was apparent to the Court that the motions did not provide a proper vehicle for resolving this exemption issue for each reporter/editor plaintiff named in the complaint since a series of individualized determinations would be required and only a few plaintiffs in this category had been deposed. After expressing this view at oral argument, counsel for both parties strongly urged the Court to at least rule on the exemption issue as to any reporter/editor deposed where, after further review of the record, the Court was able to determine that the material facts necessary for resolution of the professional exemption issue were not in dispute. The Court has since concluded it can and should resolve the 13 cases presented after individual depositions were taken.

### THE FACTS

(a) *The Washington Post*

The Washington Post produces a daily newspaper from its location in the

---

**1.** There are 48 reporters and 18 editors who have remained plaintiffs in this action.

**2.** At the time the suit was filed the cut-off figure was $740 and as of December, 1987, it had been raised to $810. *See* Letter submission of John G. Kester (dated December 29, 1987). Only six of the plaintiffs in the pending motions are paid less than this amount. The requirements of FLSA, however, preempt any collectively bargained agreement that fails to satisfy the overtime requirements of that statute. *Martino v.*

*Michigan Window Cleaning Co.,* 327 U.S. 173, 66 S.Ct. 379, 90 L.Ed. 603 (1946); *Arrington v. National Broadcasting Company, Inc.,* 531 F.Supp. 498 (D.D.C.1982).

**3.** Pursuant to collective bargaining, reporters sometimes receive a compensatory day off if they work on a day of the week when they are normally free. *See* Letter submission of John G. Kester (dated December 29, 1987).

Nation's Capitol. It is both a local and a national paper. As such, it covers events occurring locally and around the world. It does not specialize. Regular sections include Foreign Affairs, Metropolitan Affairs, National Events, Sports, Business and Finance, Style (*i.e.*, society) and Arts, together with Columns and Editorial Comment, Book Reviews, a Sunday Magazine and other similar features.

The Washington Post is not an entry-level employer of reporters/editors. It employs only reporters and editors with proven experience who have acquired demonstrable newspaper writing skills that meet the particular, exacting needs of the Post. The paper does not rely heavily on other news services. Once hired, its reporters/editors may be based at a desk located in its newsroom or at the Capitol or at city hall, or at a Washington Post bureau in Maryland or Virginia, or sent to locations in South America, Central America, the Far East, Africa or Europe, as well as throughout the United States. Management desires to meet the highest ethical standards that have been developed by journalism societies and teachers. Ample financial and advertising resources exist to support a successful, thorough newspaper venture utilizing computer systems and other modern communication and production technology and providing its reporters/editors with expense accounts and backup support personnel. The Washington Post has used its resources freely to maintain a modern, efficient operation responding to the many changes that have occurred in the news gathering and reporting business since World War II [4] and attracts many of the most experienced newswriters.

### (b) *The Role of the Reporters/Editors*

For the purposes of resolving the issue presented here one must first understand what a reporter/editor is expected to do at The Washington Post under the present regime. Every issue of the newspaper is the result of a taut, disciplined cooperative effort which must be carried forward while remaining sensitive to developing events.

Both writing and ethical standards are closely monitored in an effort to publish fair, accurate and balanced accounts for the public. It is expected that these accounts will be creative in the sense that the type of writing coupled with a reporter's full understanding of the factors influencing events "will bring the scene alive" and be interesting as well as informative. To this end, reporters are generally assigned a specific, broadly defined beat, general subject or institution. Thus, they are expected to become immersed in a particular field of activity and to be able to discern the significance of events as they occur and even to anticipate developments. Reporters write their own stories as semi-specialists, assisted by input from senior editors who aid in conceptualizing areas of interest to the newspaper as well as by other reporters in related fields. They are usually rotated after a substantial period from one beat or major assignment to another, either at their own request or to broaden their journalistic experience. In addition to their own regular writing, they may also contribute to the overall production by participation at a daily story conference, as a sub-editor overseeing other reporters in a branch office, or by drawing on their experience to write occasionally a special feature which places a community or national problem into better perspective.

In consultation with editors who themselves may have worked previously as reporters, they decide what story to pursue and when it should be abandoned, revised or postponed. Always they write; they are not legmen calling in to a rewrite desk. They may, on their own initiative or by assignment, travel abroad, conduct an investigation of a discrete topic in depth, or take special training in a foreign language or some other subject, all of which broadens their usefulness to the newspaper itself. Fellowships are encouraged and financial assistance available for this purpose; opportunity may even be provided for personal projects, such as book writing. Reporters are assisted in their day-to-day

**4.** *See* Affidavit of Ms. Elsie Carper (filed September 30, 1987.)

work by editorial aides and news and copy aides.

Reporters/editors at the skill level of these 13 men and women are usually identified to the public by a by-line when their stores are printed. Their expertise becomes known and they are consulted by outsiders as well as colleagues. They may do a bit of teaching, free-lancing and/or talk show appearances on TV and radio on the side, always holding out their association with The Washington Post. By reason of their expertise they may also belong to professional societies or appear as speakers before such groups. The combination of these factors serves to individualize their work product as well as magnify their influence within and without the paper.

Reporters have no set hours and their work may involve long hours; they are not generally required to be physically present at the Washington Post newsroom; they gather information at business or social encounters at any time of day and apparently are on call if the need arises.

Reporters/editors are regularly appraised and their progress in pay and responsibility depends on their performance as measured by well-defined criteria. They are not appraised in terms of the number of stories printed or hours worked. Rather, they are appraised by criteria that will determine whether or not they are performing the broader, more creative role for which they were hired. Their work is measured in terms of initiative, creativity, judgment, ability to handle multiple assignments, ability to complete daily assignments and projects, ability to help other reporters grow, use of language, ability to satisfy various exacting writing standards, ability to translate complicated situations into lucid prose, knowledge of subject covered, ability to expand their own knowledge, etc. The emphasis throughout is upon the individual reporter's various contributions to the objectives of the newspaper as a whole and the contributions which can be expected in the future.

*(c) The Thirteen Reporters/Editors*

The 13 reporters/editors under review here were hired at various times between 1967 and 1983 and they have had a wide variety of changing assignments. Most of them have college degrees, a long-term commitment to journalism, and all have well-tested newswriting skills gained through prior experience.[5]

Following their employment by The Washington Post, most of them have won news awards and many have benefited from fellowships or full-time study at various universities, such as Duke for public policy, Harvard for law, etc. In the course of their employment many have supervised other reporters at a Washington Post branch office. Most write under their own by-line. Some have also written purely analytical pieces in an occasional column or on the newspaper's Op–Ed page. A few have been foreign correspondents for a considerable period in places such as Argentina, Chile, China and Europe. Others have had spot assignments abroad. On the way up, several have served as bureau chiefs. All have rotated through various assignments. They have developed stories without assignment; some have written special series exploring a particular topic in depth. The group includes a number of highly experienced political reporters who report in depth on all aspects of an entire state or federal legislative session or cover national election campaigns. A few are especially adept at investigative work, able to untangle over a long, sustained period a developing, highly complex scandal such as the recent Maryland Savings & Loan story. There are also reporters who have become specialists in foreign affairs, budget matters or military affairs. Some even have training and special knowledge in the areas of science, medicine or law.

These 13 reporters/editors are appraised by the newspaper's standards, which have already been noted above. Obviously some have succeeded in achieving the desired

5. In the entire group of reporter/editor plaintiffs, 93 percent have college degrees, 25 percent have post-graduate degrees, and over one-half have some form of academic training in journalism at the college or post-college level.

goals more fully than others, as their assignments and writings suggest. They all, however, appear to have steadily progressed, developing partly as their interests as well as abilities determined. All are at a high level of journalistic proficiency which is made well known to the public in various ways. In short, they are fulfilling their expected role—a role which requires talent and superior intellectual ability.

### LEGAL ANALYSIS

When Congress enacted the FLSA in 1938, it was in response to President Roosevelt's call for legislation to establish minimum standards for free labor. The President sought a law to protect those receiving the bare necessities of life whose health was injured by long hours of toil. He spoke for those in the lowest income brackets, the underpaid and destitute receiving sub-standard pay. These are still the basic objectives of the statute.

No effort was made to list the precise jobs covered by the enactment. This was left to the Secretary of Labor to define and delineate; but bona fide professionals were exempted from the start. This imprecise term was also left undefined. However, the status of reporters under the legislation was considered prior to enactment. Indeed, the legislative history throws considerable light on whether Congress ever intended to include newspaper reporters within the Act.

The Supreme Court had recently dealt with the interstate status of the Associated Press and congressmen were conscious of how the legislation might affect the press. Assistant Attorney General Robert Jackson was responsible for articulating the Roosevelt Administration's position on the Hill. He was questioned concerning the status of reporters. After acknowledging that The Boston Globe would be in the flow of interstate commerce if it sold newspapers in New Hampshire that had originated in Massachusetts, he then expressed the view that its employees would be subject to the Act. As the colloquy between Jackson

and a sponsor of the legislation continued he indicated, however, that reporters "can come under the group of professionals" and went on to draw a distinction between workers in machine jobs, such as printers, and reporters. He concluded by advising the committee that, while it would be a matter of interpretation, he "would not think that the newspapermen would be included, because [he] would regard them as a profession."[6] This view was not disputed.

Shortly after the Act became law, the Department of Labor was obliged to recognize that the professional exemption could not be limited to the learned professions such as law and medicine, and regulations were promulgated. Without designating other specific jobs as professional, it has developed a broad exemption for artistic professions and suggested how this general exemption category might be applied to various areas of work, including jobs in the field of journalism. The professional exemption for artistic professions is stated, in relevant part, as follows:

> Work of this type is original and creative in character in a recognized field of endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee.

29 C.F.R. § 541.303(a). Writing is specifically defined as a field of artistic endeavor at § 541.303(b). The regulations then proceed at § 541.303(f) to consider newspaper writers and reporters and to emphasize that the exemption is available within this group for those doing written work which is "predominantly original and creative"; whether written work is "creative" is to be determined by its analytical, interpretative and individualized character. The work of columnists, cartoonists and editorial writers is apparently considered to be at the top of the scale measuring originality and creativity, the work of legmen at the bot-

---

6. Joint Hearings Before the Committee on Education and Labor, U.S. Senate, and the Committee on Labor, House of Reps., on S. 2475 and H.R. 7200, 75th Cong., 1st Sess. 81–82 (1937).

tom and a wide area of uncertainty left in between.

It must be recognized that these 30–year–old regulations themselves do not, however, in any respect purport to be categorical and, indeed, given the wide variety of journalism jobs and their ever-changing characteristics, cannot be decisive in the context of present day journalism. They are useful guides, nothing more. There are too many uncertainties. Similarly, occasional interpretations by the Department of Labor are also useful but not controlling upon the courts. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

Thus, in each instance a court must fashion an interpretation of the FLSA which comports with congressional purpose, *see NLRB v. Lion Oil Co.*, 352 U.S. 282, 283, 297, 77 S.Ct. 330, 331, 338, 1 L.Ed.2d 331 (1957) (Frankfurter, J., concurring in part and dissenting in part), guided primarily by the general regulations, the overall direction taken in individual rulings and by the special facts of each situation.[7]

Each situation must be judged on its merits. It is not a question of making an exception for all reporters at this or any other newspaper but rather of determining whether or not these 13 individuals while working for The Washington Post fall within or without the expanding concept accepted for identifying professional work that has evolved through individual administrative actions and the general regulations themselves.[8]

Plaintiffs insist that the work they do is far more routine than original and creative. They give great credit for the end result to a handful of editors, who are clearly professionals, and tend to deprecate the quality of their own written work. To be sure, some reporting of straight, quick, factual news is routine and does not require the full range of talent that led to the reporters being hired in the first place. All professions, including the learned professions, however, entail such more routine work and this is recognized by the Department of Labor. But this does not alter the primary, dominant, written work of these 13 reporters/editors and the artistry expected to go into it. Moreover, the collaborative editor does not take the responsibility for writing from the reporter's hands unless he or she fails to perform up to standard on a specific, occasional assignment. Nor does the fact the process may involve an element of training affect the professional status of the reporter.

The Court is wholly satisfied that The Washington Post has met its burden and is entitled on the undisputed facts summarized above to treat each of the 13 reporters/editors as professionals exempted from the overtime pay requirements of the FLSA. They produce original and creative writing of high quality within the meaning of the regulations; they have far more than general intelligence; they are thoroughly trained before employment; their performance as writers is individual, interpretative and analytical both in the writing itself and in the process by which the writing must be prepared; and their performance is measured and paid accordingly. A special talent is necessary to succeed.[9]

---

7. No court apparently has ruled on the application of the Act to reporters as opposed to editors. *See Mabee v. White Plains Publ. Co.*, 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607 (1946); *Mitchell v. Kickapoo Prairie Broadcasting Co.*, 182 F.Supp. 578 (W.D.Mo.1960), *aff'd in part sub nom., Goldberg v. Kickapoo Prairie Broadcasting Co.*, 288 F.2d 778 (8th Cir.1961).

8. Rulings exempting business research workers, dieticians, dental hygienists, dormitory proctors, driving instructors, music instructors, helicopter pilots, physicians' assistants, therapists, radio announcers and short story writers have been cited to the Court.

9. Daily readers of The Washington Post often suggest that by-line writers such as many of these plaintiffs often use their stories to intersperse editorial comment. Without venturing an opinion as to the accuracy of this suggestion, the Court notes that if the stories seem that way it is either because of the writer's skill or because the writer has lapsed into being an editorial writer. In either event, this reaction of readers tends to reinforce the view that such writers are professionals within the meaning of the statute.

This result is wholly consistent with the regulation and the legislative history. Moreover, it is reinforced by the individual rulings of the Department of Labor, which has exempted certain newspaper jobs because of factors which are typically found in the work record and required performance of each of the 13 reporters/editors reviewed here.

Unfortunately, this action appears to reflect a misconception of the thrust of the FLSA. The Act was never intended to be a substitute for collective bargaining. Some professional employees of The Washington Post may be underpaid in the light of their contribution to the enterprise and the level of compensation that professionals in some other fields apparently receive these days. However, this matter remains to be resolved at the bargaining table. Higher compensation may not be achieved by the plaintiffs' deprecation of the creative, responsible work they perform at the Post, so as to take advantage of FLSA time and a half pay for overtime requirement.

As to the remaining reporters and photographers, the Court considers it is inappropriate to go beyond the 13 selected cases discussed above. If the ruling here is affirmed, should an appeal follow, or if it is mutually accepted, it will serve to guide the result as to other reporters/editors. In any event, other plaintiffs are entitled to renew their individual claims in separate actions if they choose.

Plaintiffs' motion for summary judgment is denied; defendant's motion for summary judgment is granted; and the complaint of the 13 reporter/editor plaintiffs is dismissed with prejudice. The complaint is dismissed without prejudice as to all remaining plaintiffs. Each party shall bear its own costs. The Clerk of Court shall enter judgment accordingly.

Orders covering this ruling and other aspects of the case are attached.

### ORDER

The Court has before it cross-motions for summary judgment relating to certain Washington Post photographers, filed as companion motions to the cross-motions for summary judgment relating to reporters/editors resolved by the Court's Memorandum and Order filed this day. There are material facts in dispute as to these photographer jobs which cannot be resolved by summary judgment and all photographer plaintiffs are hereby dismissed, without prejudice.

SO ORDERED.

### ORDER

For reasons stated in the accompanying Memorandum Regarding Reporters/Editors filed this day, it is hereby

ORDERED that the motion for summary judgment filed by The Washington Post is granted as to plaintiffs Boodman, Diuguid, Engel, Hazlett, Homan, Isikoff, Kenworthy, Lardner, McQueen, Muscatine, Sherwood, Sun and Walsh, and the complaint is dismissed with prejudice as to these plaintiffs; and it is further

ORDERED that the motion for summary judgment filed on behalf of each of the plaintiffs named in the preceding paragraph is denied; and it is further

ORDERED that issues of fact exist as to all but the thirteen reporter/editor plaintiffs named above which must be resolved in separate actions and the claims of these plaintiffs are each dismissed, without prejudice, thus mooting the cross-motions as to each of them.

### SUPPLEMENTAL ORDER

The claims of 38 plaintiffs who are neither reporters/editors nor photographers are dismissed, without prejudice. Such claims may be presented in individual complaints to be determined on the facts of each case and are improperly joined in this complaint.

SO ORDERED.