Edward W. DALHEIM, et al., Plaintiffs,

v.

KDFW–TV, Defendant.

Civ. A. No. CA3–85–0894–D.

United States District Court,
N.D. Texas,
Dallas Division.

Nov. 16, 1988.

Yona Rozen of Hicks, Gillespie, James, Rozen & Preston, P.C., Dallas, Tex., for plaintiffs.

Michael P. Maslanka and David M. Ellis of Clark, West, Keller, Butler & Ellis, Dallas, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

FITZWATER, District Judge.

This wage and hour action presents questions of first impression. It requires the court to determine whether general assignment reporters, producers, directors, and assignment editors at a network affiliate television station are entitled to overtime compensation pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. § 207 *et seq.* ("FLSA"), or whether they are exempt as professional, administrative, or executive employees. Following a bench trial, the court finds and concludes [1] that the plaintiffs are entitled to overtime compensation and are not exempt from FLSA coverage. The court also finds and concludes that the defendant did not willfully violate the FLSA in failing to compensate plaintiffs for overtime, and that plaintiffs' damages do not, therefore, predate May 9, 1983.

### I.

#### A.

Plaintiffs are present and former general assignment reporters, producers, directors, and assignment editors employed by defendant, KDFW–TV ("KDFW").[2] They con-

tend they are or were required to work more than 40 hours per week without overtime pay, in violation of the FLSA. They also allege that KDFW willfully violated the Act. Plaintiffs seek to recover back wages for the period commencing May 9, 1982 to the present, plus interest, liquidated damages, reasonable attorney's fees, and costs.

KDFW responds that plaintiffs are exempt from coverage under 29 U.S.C. § 213(a)(1) as employees working in a bona fide executive, administrative, or professional capacity. Defendant also contends that any violation of the Act was not willful and that, because a two-year statute of limitations applies to nonwillful violations, plaintiffs are not entitled to damages for overtime work performed prior to May 9, 1983.

■ The resolution of the FLSA coverage question is particularly knotty in the present case. First, the determination whether an employee is exempt is principally one of fact. *See Walling v. General Industries Co.*, 330 U.S. 545, 549–50, 67 S.Ct. 883, 884–85, 91 L.Ed. 1088 (1947). The precedents found in the decisions of other courts are therefore necessarily fact-bound.[3] Second, as authorized by Congress, the Administrator of the Wage and Hour Division of the Department of Labor has issued general regulations that define the exemptions from FLSA coverage. The Secretary of Labor has also interpreted the provisions that relate to the professional, executive, and administrative exemptions. *See* 29 C.F.R. §§ 541.99–541.315 (1987). While these interpretive regulations are used by the courts for guidance and are entitled to considerable weight, *see Mabee v. White Plain Publishing Co.*, 327 U.S. 178, 182, 66 S.Ct. 511, 513, 90 L.Ed. 607 (1946); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), the regulations relevant to the

---

1. As permitted by Fed.R.Civ.P. 52(a), the court sets forth in this memorandum opinion and order its findings of fact and conclusions of law.

2. Two of the reporter-plaintiffs also are a weathercaster and sportscaster. The parties do not

dispute that these plaintiffs may be evaluated as general assignment reporters.

3. *See Sherwood v. The Washington Post*, 677 F.Supp. 9, 14 (D.D.C.1988) ("Each situation must be judged on its merits.").

present case are over 30 years old. Although the age of regulations is not *per se* an infirmity, it is arguable that the considerable technical advances that have taken place in the television industry and in broadcast journalism since 1958 have affected the weight to be given these interpretive guides. As Judge Gesell observed in *Sherwood v. The Washington Post,* 677 F.Supp. 9, 14 (D.D.C.1988):

> It must be recognized that these 30–year–old regulations themselves do not, however, in any respect purport to be categorical and, indeed, given the wide variety of journalism jobs *and their ever-changing characteristics,* cannot be decisive in the context of present day journalism. They are useful guides, nothing more.

(Emphasis added). Accordingly, to decide the questions presented, this court, to some extent, must "navigate uncharted waters without the assistance of a jurisprudential sextant." (quoting *In re Certain Asbestos Cases,* 112 F.R.D. 427, 432 (N.D.Tex.1986)).

### B.

In order to place in context the findings of fact and conclusions of law set forth *infra* in the specific context of the claimed exemptions, the court makes these general factual findings concerning plaintiffs' duties as KDFW employees.

### 1

KDFW reporters are general assignment reporters, that is, they do not normally specialize in the type of news story that they cover and report. Except on relatively infrequent occasions when reporters are assigned to report for a series,[4] they receive their assignments the day of the event they are to report and they file their story for a newscast to be aired that day.

Reporters are assigned a story by the assignment manager (who is also known as the coverage manager) and are paired with a news photographer by the assignment editor. Reporters are told the story that the station intends that they cover, what they are expected to shoot, and the intended angle or focus of the story. They are expected to interview persons that they or another KDFW employee has arranged to be interviewed, to cause to be taken the pictures pertinent to the story, and to report the story. Occasionally, reporters are told whom to interview or are informed that an interview has been prearranged and when to conduct the interview. Reporters are also provided newspaper articles, press releases, and/or wire copy to afford them the background necessary to prepare a story. The story may take the form of a reader (or set) piece, freeze frame words, voice-over ("VO"), voice-over sound on tape ("VOSOT"), or a package.[5]

At the time the reporter and photographer go to the location to film a news event, conduct an interview, or tape a reporter stand-up, the reporter will inform the photographer of the focus and background of the story in order to enhance the pertinence of the pictures taken by the photographer.

After a reporter obtains the video, any necessary natural sound or interviews, and any on-camera presentation by the reporter (the reporter stand-up), the reporter returns to the KDFW station to write the story. The manner in which a story is written depends upon the form it is to take. All stories are written to be clear, concise, and understandable. They are composed so as to be understood by a listener who will hear the words spoken only once, and who will have no written version to reinforce what is heard. A TV reporter uses more and shorter sentences than does a print reporter. A reporter will attempt to discern when natural sound, an interviewee sound bite, or pictures can tell a story more effectively or can shorten a story, and will incorporate these elements into a package. The reporter (or producer) may also decide to include file footage.

---

**4.** A series is composed of reporter packages that are telecast usually on successive nights and focus upon a particular topic or upon related topics. A series is often promoted by the station as a means of attracting or maintaining viewers.

**5.** A story may also take various forms if repackaged from one newscast to the next in order to present a "fresh" newscast.

After the reporter writes a script, the copy is subject to review by the producer of the newscast on which the story is to be broadcast. The producer infrequently changes any portion of the script. The reporter then records the narration that is to accompany the story.[6] The reporter may or may not select video. If the reporter does so, the reporter's intent is to make a point with the visual. KDFW reporters vary in whether they are present when a video editor edits the pictures to accompany the sound. Some are uniformly present, others write notes to the video editor, and others rely on the editor's judgment to select the appropriate video.

Reporters may also use graphics, superimposed writing (known as "supers," which may, for example, state a person's name or the location of a scene in a picture), and other visuals to assist the TV viewer in understanding a story. The actual graphics are prepared by a character generator operator but are selected by the reporter and, occasionally, by the newscast producer. The reporter may also write a "lead-in" for a story to be read by an anchor.

The facts of a news story dictate what the reporter will report, and the event itself and the available visuals will dictate how a story is put together. A reporter may have to "write to the video." Available sound, interviews, and quotations may also dictate the end result. All the available video and audio must be presented in an understandable way. Some reporters look for "grabbing" video to begin a story. They listen to the sound, determine that they have a sufficient knowledge of the facts, and write copy to tie up the story.

In addition, reporters attempt to present a balanced story in which both sides are given a fair opportunity forcefully to articulate their position in their own words.

Stand-ups are included in a package for various reasons. Some reporters use them to personalize a story; others use them only when video that better reports a story is unavailable. Some reporters rarely use stand-ups.

Some reporters appear in live shots carried by electronic newsgathering (ENG) devices or, if long distance, by satellite newsgathering (SNG) equipment. These live shots are usually scripted unless, in the case of breaking news, there is insufficient time to prepare a script.

Reporters and photographers interrelate to produce the best pictures possible. To this end, reporters inform the accompanying photographer what the story is about and the intended angle or focus of the story. They give the photographer their own ideas of the event, the available background material, and information concerning the interviews they will do. Some reporters suggest to the photographer what to shoot; others do not or rely upon the photographer's prior experience (such as when covering a regular news event) to know what to shoot.

The testimony differed concerning the relative value to be ascribed to a reporter's personal characteristics. The court finds that reporters, in the main, attempt to speak in a conversational tone and that reporters who have a low pitch voice and forceful delivery are generally viewed as credible and knowledgeable. Successful reporters are described as having a "presence," which can be the product of a pleasant appearance, a strong and appealing voice, and a believable and comprehensive presentation. Reporters who have a strong presence are more readily recognized by the viewing audience.

Some reporters make business stories more factual and social issues stories more personal. Other reporters attempt to personalize every story, in the belief that viewers care more about people than about news events. Certain reporters try to make all their stories interesting and compelling. Reporters attempt to enhance viewer credibility by possessing a full and complete grasp of the facts of a story.

---

**6.** In the case of a package, the narration may be extensive. When the story takes other forms there may be limited or no reporter narration.

They also attempt to find a new and varied way to tell the same story and try to tell a story without utilizing obvious visualizations.

2

KDFW newscast producers [7] are responsible for the content of the news portion (10–12 minutes) of a 30–minute newscast. They participate in a morning or afternoon meeting where stories and story angles are decided. They report to the executive producer. Subject to approval, the producer sets the length of a story. The producer can edit a reporter's work, but the reporter can appeal such decisions to the executive producer. The producer can suggest the content of visuals and words for a story. Producers review reporter stories before they go to the video editor. They possess the authority to revise a story, but revisions are made less than 50% of the time. The executive producer is the final authority for determining what to do regarding a story. In the executive producer's absence, the show producer decides.

Producers discuss available stories at the morning and afternoon meetings. Certain producers watch the network feed and monitor the wires for appropriate stories. They time the length of feed stories and talk to reporters about their stories. Producers categorize top stories by using the lead stories on the news wire. Producers prepare a written newscast format by anticipating stories, placing them in order, and determining commercial breaks. They consider technical aspects, breaks, and whether videotape is needed. Producers write some stories on their own or collaborate with the associate producer. They also see that the format is delivered to the videotape editors for recutting other newscasts.

During a newscast, the producer sits in the control room, monitors the newscast, and times the newscast to ensure that it is on time. If it is not, the producer lengthens or shortens segments. The producer has authority to extend a newscast to cover a major breaking story. Newscasts consist of various elements including: reporter packages, reader (or set) pieces, VOs, VO-SOTs, and live remotes. Producers decide the form that a story will take. They must have a general understanding of pacing between program elements. Producers do not have authority to hire or fire employees.

Producers put together newscasts based upon experience in determining the play given a story on the wires, in the newspaper, on the radio, and on the networks. The producer balances a story with the time required to tell it and the viewer's needs. The producer prepares a format with stories that permit time adjustments. There are known techniques for adjusting time. The producer is the equal of assignment manager in the sense that the assignment manager says what is to be covered and the producer determines what is to be included in the newscast.

The determination regarding which stories to run is a judgment call based on the availability of pictures and what is considered to be important to the viewer. The executive producer and news director can question a newscast producer regarding a decision but they usually understand why the producer undertook the course of action. The standard situations in which a show producer obtains the advice of the news director or executive producer are when there are legal questions or a decision involves the expending of money. The producer does not decide the angle or focus of a story but does review the packages and all scripts that will be included in the newscast. The producer can influence what stories get covered.

Producers coordinate the efforts of others to ensure that KDFW employees are writing stories and editing tape so that the newscast is ready to air. The producer prepares the format for the newscast, which is then approved by the executive

---

**7.** Unless otherwise specified, the term "producer" means the producer of a particular newscast

producer.[8] The executive producer may change the format by altering the order of the stories, and adding or deleting stories. Often, no changes are made.

The producer decides the story line-up according to what is the big news of the day. The producer leads with an important story, such as a breaking story or one that affects the most people, and follows with other important stories. The producer uses news judgment to make these determinations. Stories are stacked in an order that makes sense. Related stories are grouped, if possible. Stories are paced so that anchors are given the opportunity to rest and stories of the same form (e.g., voice-overs) are not run back-to-back. Informational stories are inserted so that they can be cut if the show is running long. The producer can also decide whether to "float" a story to another part of the newscast if necessary. The flow of a newscast is important, as is pacing and breaking, in order to keep the viewer watching.

KDFW producers also do some writing. This may involve rewriting newswire copy, writing a story for a reporter who is covering another story, or writing a story that has been covered by a photographer without a reporter (such as a fire early in the morning). Producers also write anchor set pieces, VOs, and transitions. Occasionally, a producer rewrites a reporter's version of a script. The producer also has input in whether stories will include graphics.

Producers are expected to and do provide story ideas. According to management, they are the key editing people in the newsroom. The producer is responsible for molding the newscast, giving it sharpness and distinction, with bits of interesting news to make one newscast better than another. Producers are expected to use bumps and teases, and electronic and technical "bells and whistles" to make a newscast interesting. They can do this through use of music, visual squeezes, compression of pictures, and prerecorded sound bites. A good producer weaves interesting newscasts by use of good news judgment, writing, use of visuals, bumps, headlines, and preproduction graphics.

The producer also gives the anchors assignments, such as writing headlines, prenews teases, actual stories for broadcast, repackaging, and voice-overs of network feed stories. Producers inform ENG operators (videotape editors) what particular visuals to use in bumps, teases, supers, and graphics. The producer reviews reporter copy to ensure that it is accurate, clear, concise, and interesting.

The look of the show is designed to be the same regardless who produces it. The content is different from show to show.

When producers apply for jobs, they mention their creativity, their ability to make the news interesting, and how much the audience watches their work.

3

KDFW directors perform directing and non-directing functions. The directing duties include directing newscasts, station IDs, station newscast teases, station headlines, public affairs programs, and preproduction work. The non-directing duties include screening commercials for technical quality and content acceptability (such as deceptive advertising or audience suitability).

Commercial screening is performed according to Times Mirror Corporation standards set out in a book supplied by the program director. If a director determines that a commercial may violate a standard, the director brings this to the attention of management, which makes the ultimate decision. The director reviews national advertising simply to ensure that the label

---

or show.

**8.** The testimony reflected a somewhat different relationship between news department management and the 5 and 6 o'clock show producers, on the one hand, and management and the 10 o'clock show producer on the other. Management is usually still at the station when the 5 and 6 newscasts are aired and are available on-site. They are not available on-site (although they are available by phone) for the 10 o'clock newscast. The 10 o'clock show is also the one watched by the most viewers. Therefore, the 10 o'clock producer is usually a more experienced person who has less need for management supervision.

matches the content. This job function takes 20 minutes to one hour daily.

When a director directs a newscast, the director is provided a copy of the script and prepares the technical instructions in order to "call" the show. On the basis of the producer's decision concerning the form of a story, the sequence of stories, whether the story is live, remote, or on tape, the director determines what camera to use, and what machine will be the source of tape or a preproduction graphic. Other employees actually operate the cameras, remote equipment, and graphic production devices. The director calls the show by cuing technical personnel and on-camera talent as to when to perform. These personnel know how to perform their jobs, know when a task is coming up in sequence, but await the director's cue to perform the task.

Management determines in advance the standard "look" of the show, including standard lighting, camera shot blocking, closing shot style, and sequence of opening and closing graphics. The director is to ensure that the telecast conforms to the prescribed look.

Directors also direct some public affairs programming. These programs are unscripted and the director is responsible for calling the camera shots (i.e., tighter or looser shot of guest or of host and guest) in a manner that interests the viewer in the show. The director has more latitude in calling a public affairs program. Plaintiffs' witnesses testified that this type of directing is cut and dried, involving uncomplicated camera angles and a basic set. Management testified that directors can use creativity in directing such a program so as to make an essentially dull program more interesting—to meld the technical with the artistic—in order to make an aesthetically pleasing composite whole.

Directors also direct preproduction work. This includes various technical visual processes that are used in a newscast and reporter packages. Examples are dissolving two pieces of material recorded on another piece of tape, superimposing pictures over background shots, and superimposing statistics over a background. The director calls this work by informing the technical equipment operators when to perform their assigned tasks.

Directors attempt to avoid a newscast that looks disjointed and lacks continuity. Shot composition and timing are important for an aesthetically pleasing newscast. The director does not select who will work on a newscast or assign crew members their jobs. Directors must have the ability to keep cool in a crisis. When directors apply for employment, they tout their ability to make the news interesting, their creativity, and how much the audience watches their newscasts.

4

Assignment editors are supervised by the assignment (coverage) manager. Their primary function is to pair reporters with photographers in order to cover stories that management, the assignment manager, and the show producers have decided should be covered. They also pair reporters with videotape editors. The pairing process is based on availability of personnel. They also monitor police and fire department scanners, wire services, newspapers, and day files that contain story ideas (based upon newspaper clippings and press releases). Part of their job is being aware of what is making news. There are three assignment editors: dayside, nightside, and weekend. These persons do not attend the newscast meetings or conference calls in which coverage decisions are made.

Assignment editors are given general guidelines regarding stories that will be covered. The editors pass these ideas on to persons in higher authority, such as the assignment manager and other management. Assignment editors inform reporters what a story is about, provide them with available background information, and may suggest whom to interview. The assignment editor does not have authority to pull a reporter from one story to another but can pull a reporter off a "marginal" story to cover a breaking story. The assignment editor has 2-way radio contact with crews in the field and is responsible for knowing their location. Occasionally,

assignment editors suggest story ideas. Some may be based upon telephone tips phoned in from the public. These employees use news judgment to discern when a story is worth pursuing. Assignment editors also clip stories from newspapers for inclusion in the day file.

## II.

## A.

■ The burden of proving that the plaintiffs are exempt from coverage rests with the employer, KDFW. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2228–29, 41 L.Ed.2d 1 (1974); *Paul v. Petroleum Equipment Tools Co.*, 708 F.2d 168, 170 (5th Cir.1983). The employer has the burden of establishing by affirmative evidence all the necessary requirements of the exemption. *Clark v. J.M. Benson Co., Inc.*, 789 F.2d 282, 286 (4th Cir.1986); *Donovan v. United Video, Inc.*, 725 F.2d 577, 581 (10th Cir. 1984). The exemptions, moreover, are narrowly construed against the employer seeking to assert them and their application is limited to those plainly and unmistakably within their terms. *Arnold v. Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960).

There are two methods of qualifying an employee as exempt. Under the "long test," employees earning less than $250 per week must satisfy certain detailed criteria. *See* 29 C.F.R. §§ 541.1, 541.2, and 541.3. If the employee is paid more than $250 per week, the employee must satisfy only the "short test" criteria to qualify for the executive, administrative, or professional ex-

emption. *See* §§ 541.119, 541.214, and 541.315.[9] In the present case, all the plaintiffs earned or earn in excess of $250 per week. The court therefore employs the "short test" to determine whether the plaintiffs are exempt from the right to overtime compensation.

## B.

The court begins with KDFW's contention that it has proven the reporter, producer,[10] and director plaintiffs are exempt as "learned" or "artistic" professionals.

### 1

■ KDFW's contention that plaintiffs are exempt as "learned" professionals need not long detain the court. To be "learned" under the short test, the profession must be one "requiring knowledge of an advanced type in a field of science or learning." § 541.315(a). In explaining what this language means under the long test and what a "learned profession" is, the regulations state that this knowledge must be "customarily acquired by a prolonged course of specialized intellectual instruction and study as distinguished from a general academic education and from an apprenticeship and from training in the performance of routine mental, manual, or physical processes." *Id.* § 302(a).[11] The professional's knowledge must be "acquired by a prolonged course of specialized intellectual instruction and study," and does "not include the members of such quasi-professions as journalism in which the bulk of the employees have acquired their skill by experience rather than by any formal specialized training." *Id.* § 302(d).[12] Also, in a "learned profession," an "advanced aca-

9. All section citations that follow are to 29 C.F.R. unless otherwise indicated.

10. All the producer-plaintiffs are individual newscast producers; that is, they have responsibility for producing a particular newscast as opposed to the executive producer, who is a member of management and has general production authority and responsibility.

11. The regulations analyze what type of work is "learned" or "artistic" in light of the long test. The same characterization and understanding of what constitutes "learned" or "artistic" work is necessary, however, before one can apply the

short test. Section 541.302 is the only section in the regulations that describes what a profession must be in order to be "learned" and it is thus important in the court's analysis.

12. As the court notes *supra,* the court in *Sherwood,* 677 F.Supp. at 14, noted that the regulations in question are now 30 years old and "cannot be decisive in the context of present day journalism." While the evidence adduced at trial demonstrates that many aspects of broadcast journalism are professional in nature, the evidence does not warrant the finding that journalism is a "learned" profession.

demic degree is a standard (if not universal) prerequisite." *Id.* § 302(e)(1). In an analogous journalistic context, the regulations instruct that "[n]ewspaper writers, with possible rare exceptions in certain highly technical fields" do not qualify under the learned profession exemption of § 541.3(a)(1). *Id.* § 303(f)(1).

The evidence adduced at trial demonstrates that many aspects of broadcast journalism are now professional in nature. There are, throughout the country, numerous undergraduate and several graduate degree programs devoted either to broadcast journalism/mass communications alone or to journalism generally, with a concentration in broadcast journalism. Many broadcast journalists now obtain undergraduate degrees before seeking full-time employment. Broadcast journalists attempt to conform their work to established standards of ethics.

Nevertheless, the record also reflects that broadcast journalism does not customarily require a knowledge of a field of science or learning.[13] An advanced academic degree is not a standard or universal prerequisite. Some of the plaintiffs, and members of KDFW news department management, have not graduated from college or have a college degree in an unrelated field. KDFW management prefers to hire persons with college degrees for the positions in question here, but does not require a degree. The evidence reflects, moreover, that the performance of a reporter, producer, or director is primarily enhanced by work experience (starting in smaller television markets and advancing to larger ones). This is more akin to "an apprenticeship and ... training" rather than "intellectual instruction and study." The court finds and concludes that the plaintiffs are not exempt as "learned" professionals.

### 2

KDFW next contends that reporters, producers, and directors are exempt as artistic professionals. As to reporters, defendant argues that their writing is primarily original and creative and thus exempt within the meaning of § 541.303(a). KDFW also posits that TV reporters must have a "presence" on camera, are hired not only for their journalistic skills but also because of intrinsic qualities with respect to their personality, voice, and manner, and are thus artistic professionals within the reach of § 303(e)(1). As to producers and directors, defendant reasons that these employees are exempt because they use creativity in performing their job duties, particularly in using invention, imagination, and talent in preparing a format in such a manner as to make TV viewers stay tuned to KDFW–TV. As a general proposition, defendant urges the court to recognize that the regulations are over 30 years old and necessarily do not encompass artistic professions that have their genesis in technological changes that have come to fruition since 1958. KDFW also points out that the regulations themselves envision that "[t]he areas in which professional exemptions may be available are expanding." *Id.* § 302(e)(2).

Plaintiff-reporters contend they are not artists because they do not perform original and creative writing. They are discouraged from including their own commentary or opinion in a story. There is a formula for putting together packages and in many respects a reporter is restricted and directed by management and the constraints of the story itself. The use of special effects and graphics by reporters does not change this result because there is a definite format and sameness to the special effects utilized. The station desires that there be uniformity in effects so that the viewer will be comfortable with the station. The manner in which graphics are used in packages is consistent and repetitive. Graphics are generally used in pieces where there are a number of statistics involved or when there are several points or statements which the viewer needs to keep in mind simultaneous-

---

**13.** A weathercaster, for example, can obtain the seal of approval of the American Meteorological Society. The required academic courses are substantive in nature, but the academic regimen is not so prolonged as to warrant the finding that an approved weathercaster is a learned professional.

ly. The reporters reject KDFW's reliance upon supposed inherent qualities of reporters, contending these are more germane to anchors. The reporters argue that their appearance on camera is brief, and that, while there is a minimum standard of presentability, there is not a particular look or voice quality required and there is, in fact, great variation among reporters.

Plaintiff-producers contend they are not artistic professionals because the selection of stories and formatting of a newscast is not creative. The selection and presentation of stories is generally dictated by the order of importance in which stories are played in other sources such as the newspaper, wire service, and network. Decisions to include or delete a story are not decisions of great consequence. The choices and selections available to producers fall only within a certain framework established by station management as to the type of stories that will be included within a particular newscast. Producers have substantial guidance from upper management as to the relative importance of stories. The executive producer reviews all formats.

Plaintiff-directors argue that they are not artistic professionals because the directing they perform consists of no more than coordinating and does not allow for creative leeway that might be available to a director of documentary or dramatic films. Newscasts are specifically formatted by management and outside consultants. Decisions regarding the blocking of shots and lighting are made by the news director, a management position. The preproduction work that a director does is specifically formatted and repetitive with little room for director input. The calling of a show is a technical process that requires experience and skill but is in many respects simply mechanical. The aspects of a newscast or show that go awry are recurring in nature and directors do not use creativity and imagination in dealing with them.

The short test for artistic work requires that the employee's primary duty consists of performing "work requiring invention, imagination or talent in a recognized field of artistic endeavor" and that the employee must be "doing primarily" such work. *Id.* § 315(a).

The regulations more fully describe under the long test rubric what constitutes professional artistic work. The regulations state that this type of work is: (1) original and creative in character (as opposed to "work which can be produced by a person endowed with general manual or intellectual ability and training"); (2) in a recognized field of artistic endeavor; (3) the result of which depends primarily on the invention, imagination, or talent of the employee. § 541.303(a). The regulations then identify recognized fields of artistic endeavor as including the fields of music, writing, the theater, and the plastic and graphic arts. *Id.* § 303(b). As to each recognized field, the regulations explain the type of work that is considered "artistic" because it is original and creative, § 303(c)(1) & (2), or because it depends primarily on the invention, imagination, or talent of the employee, § 303(d).

a

The question whether reporters at KDFW are artistic professionals ultimately becomes one of proof. The court concludes, first, that general assignment reporters *can* be artistic professionals because significant technological advances in how broadcast news is gathered and presented to the viewer have required that reporters produce work that is original and creative in character, the result of which depends primarily on the invention, imagination, or talent of the employee. There is evidence that KDFW reporters use originality, creativity, invention, imagination, and talent in their work. The proposition that they are artistic professionals is, in fact, not as far-fetched as plaintiffs suggest. Nevertheless, the burden of proving the exemption, and in turn that the plaintiff-reporters are artistic professionals, rests with KDFW. The exemptions are to be narrowly construed against KDFW, and their application is limited to those plainly and unmistakably within their terms. Although the question is a close one, the court thus finds, second, that KDFW did

not prove by a preponderance of the evidence that the work of its plaintiff-reporters is so "primarily" inventive or imaginative, or routinely original and creative, that the court can find they are artistic professionals.

The court turns first to the conclusion that general assignment reporters *can* be artistic professionals.

The portions of the regulations [14] that most closely relate to the plaintiffs in the present suit pertain to the work of newspaper writers and reporters and radio and television announcers. Regarding newspaper writers and reporters, the regulations provide: the majority of reporters do work which depends primarily on intelligence, diligence, and accuracy. It is the minority whose work depends primarily on invention, imagination, or talent. § 541.303(d). Newspaper writers and reporters with the same job titles may be either exempt or non-exempt employees, depending upon their job functions. Exemption for newspaper writers as professional employees is normally available only under the provisions for professional employees of the artistic type. *Id.* § 303(f)(1). Newspaper writing of the exempt type must be predominantly original and creative in character. *Id.* Only writing which is analytical, interpretative, or highly individualized is considered to be creative in nature. *Id.* Newspaper writers who commonly perform work that is original and creative within the meaning of § 541.3 are editorial writers, columnists, critics, and "top-flight" writers of analytical and interpretative articles. *Id.* The reporting of news, the rewriting of stories received from various sources, or the routine editorial work of a newspaper is not predominantly original and creative in character within the meaning of § 541.3 and is not exempt. *Id.* § 303(f)(2). A reporter or news writer ordinarily collects facts about news events by investigation, interview, or personal observation and writes stories reporting these events or submits the facts to a rewrite man or other editorial employees for story

preparation. This is non-exempt work. *Id.* The leg man, the reporter covering the police beat, and a reporter sent out under specific instructions to cover an event, are normally performing duties that are not professional in nature within the meaning of the FLSA and § 541.3. *Id.*

With respect to radio and television announcers, the determination of exempt and non-exempt status is relatively difficult because of the merging of the artistic aspects of the job with the commercial. *Id.* § 303(e)(1). There is considerable variation in the work performed. *Id.* The differences that dictate whether one is a "name" announcer or a "staff" announcer are found in the announcer's personality, voice, and manner and in some inherent special ability or talent "which, while extremely difficult to define, is nevertheless real." *Id.* Announcer duties which are considered exempt include: functioning as a master of ceremonies; playing dramatic, comedy, or straight parts in a program; interviewing; conducting farm, fashion, and home economics programs; covering public events, such as sports programs, in which the announcer may be required to ad lib and describe changing events; and acting as a narrator and commentator. *Id.* § 303(e)(2). Non-exempt work includes giving station identification and time signals, announcing the names of programs, and similar routine work. The determination of the appropriate status is in large part dependent upon whether the employee's duties are original and creative in character and whether they require invention, imagination, or talent. *Id.* The determination whether a particular announcer is exempt must be based upon his individual duties and the amount of exempt and non-exempt work performed, as well as the employee's compensation. Primary duty as defined in the regulations means the major part, or over fifty percent, of the employee's time. *Id.* § 103.

These regulations were promulgated when television was in its relative infancy.

---

**14.** *See supra* note 11. Section 541.303 is the only section in the regulations that describes what a profession must be in order to constitute

an "artistic" profession. This section is thus important to the court's analysis.

The technological innovations brought about by color picture transmissions, satellite and electronic newsgathering, computer and electronic generated graphics, microwave transmissions, and videotape use, have all combined dramatically to transform television news as a visual medium. The regulations of 30 years ago appear to be influenced substantially by concepts more appropriately associated with print journalism. Newspaper writers produce work that depends primarily on intelligence, diligence, and accuracy. This is also an integral part of the work of a broadcast journalist. But TV reporters must also capture the viewer's attention, and enhance the viewer's understanding in a relatively short time frame by relating the news through the use of pictures, sound, and words—words that are understandable to the ear. These technological advances have rendered unpersuasive any generalized notion that broadcast journalists cannot be artistic professionals, and the court concludes that they can be found to be exempt, artistic professionals on the basis of appropriate evidence.

The court turns second to the finding that KDFW general assignment reporters do not do work that is so primarily inventive or imaginative, or routinely original and creative, that the court can hold that they are artistic professionals. The present case—like all wage and hour decisions—comes down to a question of proof. The exemptions are to be narrowly construed and applied only to those plainly and unmistakably within their terms. KDFW has not sustained its burden of proof by a preponderance of the evidence.

KDFW did persuade the court that its reporters from time to time use creativity, invention, imagination, and talent in portions of their work. This is especially true in series packages and feature pieces and is also reflected in some of their daily work. KDFW failed to convince the court, however, that a reporter's artistic work represents the reporter's primary duties; that is,

that a reporter's work is primarily inventive or imaginative or original and creative.[15]

From a preponderance of the evidence, the court finds that the work of the plaintiff-reporters depends primarily on intelligence, diligence, and accuracy. Reporters are told which stories to cover and are informed of the focus or angle of the story before they cover it. They are often told whom or what type of person to interview. They use essentially a standard format of pictures and sound to cover most stories. They attempt to obtain both sides of a story and choose video and audio that informs the viewer and fairly sets out any competing viewpoints. There is a well-established format and sameness to the special effects that are utilized. Their work—day in and day out—is not predominantly original and creative because they do not produce analytical, interpretative, or highly individualized reporting. As with print journalists, the reporters ordinarily collect facts by investigation, interview, or personal observation and then write and report the events in a standard form, ranging from a VO to a package. Like print journalists, KDFW reporters primarily use intelligence, diligence, and accuracy to report facts. They do not rely principally upon creativity, invention, or imagination.

Local affiliate reporters are not, moreover, the modern-day version of the "name" announcer discussed in § 303(e)(1). At the local or regional market level the "name" announcers are the newscast anchors. The evidence at trial reflected that KDFW promotes its anchors but only rarely promotes reporters. While the evidence persuades the court that good reporting, in the aggregate, leads to a successful newscast, the evidence does not convince the court that individual reporters draw viewers in measurable numbers. Indeed, common sense dictates that if a profit-motivated operation like KDFW discovered that reporters—as individuals—measurably af-

---

**15.** For a case determining that plaintiffs had talent and training for original artistic production and that the work required this capability, but that the employees were non-exempt be-

cause their work was not predominantly of that character, see *Stranger v. Vocafilm Corp.,* 151 F.2d 894 (2d Cir.1945).

fected ratings, the station would tout the reporters to the viewing audience.

### b

■ The court finds next that producers are not exempt as artistic professionals. The court is not persuaded that their work is original and creative or that the result depends primarily upon the invention, imagination, or talent of the producer.

The writing that a producer does is most closely akin to that of the "rewrite man" described in § 303(f)(2). Producers usually revise work prepared by reporters, wire services, or earlier broadcast news stories. Their work is not primarily original and creative.

The court also rejects the contention that producers primarily use invention, imagination, and talent in formatting a newscast. There is some testimony that a talented producer can weave a newscast in a particularly pleasing manner and can add "bells and whistles" that differentiate one newscast from another. The preponderance of the evidence, however, supports the finding that producers follow accepted conventions in selecting lead stories, grouping related stories, pacing the broadcast, avoiding monotony in sequencing forms of stories, and incorporating stories that can be added or dropped. The court is persuaded from a preponderance of the evidence that producers do not depend primarily upon their invention, imagination, or talent in performing their jobs.

### c

■ The court finds that directors, like producers, are not exempt as artistic professionals.

KDFW directors are trained and experienced employees who have the resultant ability to cue other trained personnel to commence and complete a function in accordance with the director's cue. Directors do not primarily rely upon their invention, imagination, or talent in performing their work. Many of their decisions are obvious because station management has prescribed the "look" of the newscast in much detail. Directors have more leeway in public affairs programming but the court is persuaded by the evidence that, even here,

KDFW directors operate principally within accepted guidelines and do not function primarily upon the basis of invention, imagination, or talent.

### C.

The court next considers KDFW's contention that plaintiff producers, directors, and assignment editors are exempt as administrative employees. The court finds and concludes that KDFW has not met its burden of proving that both elements of the administrative "short test" are met, that is: (1) that the primary duty of the employee consists of "office or non-manual work directly related to management policies or general business operations" of his employer; and (2) which "includes work requiring the exercise of discretion and independent judgment." *See* § 541.214(a).

■ Regarding the first element, the regulations explain that the phrase "directly related to management policies or general business operations" means activities "relating to the *administrative* operations of a business as distinguished from '*production*'...." *Id.* § 205(a). (Emphasis added). The regulations define the administrative operations of a business as including white collar work such as "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." *Id.* § 205(b). The key factor, therefore, is whether the employee's activities focus on administrative-type work or on the production process itself. Production work is generally not considered to be "directly related to management policies or general business operations," and thus fails to meet the administrative exemption.

The sole way for production or operations-type work to meet the "directly related" element is if the employee is one who carries "out major assignments in conducting the operations of the business or whose work affects business operations to a substantial degree, even though [the employee's] assignments are tasks related to the operation of a particular segment of the business." *Id.* § 205(c). The regulations

thus require either administrative activity work or work of a substantial importance to the business as a whole in order to meet the first element of the administrative exemption.

According to the regulations, the second element—exercise of discretion and independent judgment—means "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." *Id.* § 207(a). This term "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." *Id.* The term, however, does "not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review." *Id.* § 207(e)(1).

The regulations also emphasize the two most misunderstood and misapplied uses of the term "discretion and independent judgment." This term is often confused with the (1) "use of skill in applying techniques, procedures, or specific standards; and (2) misapplication of the term to employees making decisions relating to matters of little consequence." *Id.* § 207(b). It is clear that

> [a]n employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes or other categories, with or without the use of testing or measuring devices, is *not exercising discretion and independent judgment* within the meaning of § 541.2.

*Id.* § 207(c)(1). (Emphasis added).

1

■ The court finds first that KDFW producers do not perform, as their primary duty, work that is directly related to management policies or general business operations. This is so because their work

is not related to the "administrative" aspects of the business and is not of importance to the business as a whole to a "substantial degree." [16]

The work of KDFW newscast producers, which the court describes above at § I(B)(2), does not qualify as administrative work under the regulations. The regulations contemplate that administrative work includes advising management, planning, negotiating, representing, and promoting the company. *Id.* § 205(b). The work of the plaintiff newscast producers, however, concerns the actual production aspect of KDFW's business.

KDFW producers are responsible for the content of the news portion (10–12 minutes) of a particular newscast. They decide, based upon the relative importance and length of a story, the order in which news stories will air and prepare a format for the show. Producers time the newscast. If technical, logistical, or talent difficulties cause the newscast to run long or short, the producers are responsible for adding stories or deleting or altering the length of stories. The duties of the producer clearly relate to the production of a KDFW news department product and not to defendant's administrative operations. KDFW producers thus fail to meet the first element necessary to be administratively exempt under the regulations. *See id.* § 205(a) & (b).

The producers also fail to meet the first element because their work does not consist of carrying out major assignments or work of substantial importance to KDFW's business as a whole, as those concepts are understood in FLSA jurisprudence.

Newscast producers use techniques, procedures, repetitious experiences, and specific standards to carry out their work. The producer knows in advance how much time is available for news (as opposed to weather, sports, and commercials). The standard length of the stories is dictated by station management and by the relative importance of the story. The standards for deciding how to lead a newscast, how to group and bridge related stories, and when

---

**16.** As with the question whether reporters are artistic professionals, this fact issue is also a close issue which the court ultimately decides as a matter of proof.

and how to cut stories are known in the industry. Producers merely utilize their knowledge in following these prescribed procedures or in determining what procedures to follow. This process helps support station management's desire that one newscast appear similar to another, regardless who produced or directed it.

The loss of one link or job can alone have a disastrous effect and even prevent the production of a product. The loss of the producer during a newscast may have this same effect. Under the FLSA, however, an employee's job can even be "indispensable" and still not be of the necessary "substantial importance" to meet the "directly related" element. *Clark,* 789 F.2d at 287; *see* § 541.205(c)(2). This is so because the regulations emphasize the "*nature* of the work, not its ultimate consequences." *Id.* (Emphasis in original). As the regulations point out, a messenger carrying a large sum of money, an employee operating expensive equipment, and an inspector for an insurance company all can cause serious loss or consequences by their failure to do their job properly, and yet these employees are "not performing work of such substantial importance to the management or operation of the business that it can be said to be 'directly related to management policies or general business operations'...." *Id.* § 205(c)(2).

KDFW has failed to meet its burden of proving that its producers perform work "directly related to management policies or general business operations" because of the substantial importance of their duties. The nature of the employee's work, and not the possible results or consequences, is the focal point of the regulations. As the court explains above, KDFW producers use techniques, procedures, repetitious experience, and specific standards to perform their work. Many of the standards and procedures that they follow are dictated by station management or are otherwise

known generally in the industry. The producers utilize their knowledge in applying these techniques or procedures as part of a skilled, integrated KDFW production team. The producers thus do not perform work of such substantial importance that it is considered under the regulations to be "directly related to management policies or general business operations." KDFW has failed to prove by a preponderance of the evidence that its newscast producers are exempt as administrative employees.[17]

**2**

For the same reasons that apply to KDFW producers, the court finds that KDFW directors fail to meet the "directly related" element of the administrative employee exemption.

The court also finds that directors are not exempt because their work does not require the exercise of discretion and independent judgment. The directors in question do perform some screening of commercials, direct public affairs programs, and direct preproduction work. These duties are analogous, however, to functions that the regulations consider to be non-exempt. The screening of commercials for technical acceptability and conformance with good broadcast standards is based on criteria established by station management. Directors, when screening commercials, are merely employing skill in the application of techniques and procedures, not discretion and independent judgment. *See id.* § 207(c)(5) ("screening" based on standards set by the company is non-exempt). The preproduction work is also principally technically oriented.

KDFW directors also direct one or more of the weekday and weekend newscasts. The "calling" of a newscast involves highly developed skills, executed under pressure and arduous time constraints, but does not involve discretion and independent judgment in the sense envisioned by the regulations. The director plans the sequence of

---

**17.** Although the court need not consider the second element—independent judgment and discretion—the court observes that a more lenient test applies when the short test is applicable. Under the § 541.2(b) long test, an employee must "customarily and regularly" exercise independent judgment and discretion; under the § 214(a) short test applicable in this case, the employee's primary duty must simply "include work requiring the exercise of discretion and independent judgment." *See Dymond v. U.S. Postal Service,* 670 F.2d 93, 95 (8th Cir.1982).

the camera shots, the timing and sequence of special effects, and performs preproduction work. Station management and outside consultants, however, prescribe the "look" of the set and general policy concerning how the newscast is to be presented to the viewer. The flow of the show is actually dictated in large measure by station management's allocation of time to news, weather, and sports, and by how the news portion is stacked by the producer. Other decisions, such as the blocking of camera shots, are made by the news director.

KDFW directors do not supervise or assign the work that is performed by the various members of the technical crew. The director's duty is principally to coordinate the activities of various skilled people so that everyone is on the same time cue. A technical skill and expertise is involved, not an exercise of discretion and independent judgment concerning matters of significance or policy.[18]

3

■ For the same reasons that apply to KDFW producers and directors, the court finds that KDFW assignment editors fail to meet the "directly related" element of the administrative employee exemption. The court finds that the assignment editors do not have as their primary duty the performance of work which requires the use of independent judgment or discretion.

The assignment editor's duties consist of pairing reporters with photographers, monitoring police scanners for stories, and reviewing newspapers, press releases, and wire copy for possible stories. Assignment editors do make some decisions that involve the use of judgment, but these decisions are within prescribed parameters; anything outside their narrowly circumscribed range of responsibility must be approved by station management. They do not exercise discretion and independent judgment in

their work, especially not as to matters of significance.

D.

■ The court turns finally to KDFW's contention that the producers, directors, and assignment editors are bona fide executive employees exempt from the FLSA, and finds and concludes they are not.

The short test for the executive exemption provides that an employee is exempt if "the employee's primary duty consists of the management of the enterprise in which [he is] employed or of a customarily recognized department or subdivision thereof and includes the customary and regular direction of the work of two or more employees therein." § 541.119(a). The first element that KDFW must prove is that the primary duty of these employees is management.

Activities considered under the regulations to be management duties include the following: interviewing, selecting, and training employees; setting and adjusting employees' rate of pay and hours of work; directing their work; keeping records for supervision and control; evaluating job performance of employees for the purpose of making recommendations as to promotions or other changes in their status; handling their complaints and grievances; disciplining them when necessary; and other various supervisory tasks. *See id.* § 102(b).

The court holds that the duties of the producers and directors fall short of the necessary requirement of management as the primary duty. Factors useful in determining if management is an employee's primary duty include the amount of time spent in management activity, the importance of those management duties, the frequency of exercising discretion, and freedom from supervision. *See id.* § 103. The directors and producers in the instant case

---

**18.** Other cases have held that highly trained technicians who exercise no discretion, control, or administrative functions, but rather must always consult a superior on any major policy change, are not exempt under the FLSA. *See, e.g., Martin v. Penn Line Services, Inc.,* 416 F.Supp. 1387 (W.D.Pa.1976); *Reeves v. Interna-*

*tional Telephone & Telephone Corp.,* 357 F.Supp. 295, 301 (W.D.La.1973). *See also Pezzilo v. GTE Information Systems,* 414 F.Supp. 1257 (M.D. Tenn.1976), *aff'd,* 572 F.2d 1189 (6th Cir.1978) (computer programmers not exercising discretion and judgment but exercising job skill).

spend almost no time in true management activity. The producers prepare and arrange the format of the show and do not manage other individuals who participate in the creation of the newscast. The other people with whom the producers come in contact (*e.g.,* reporters, assignment editors, and associate producers) are all actually supervised or directed by management positions such as the assignment manager, executive producer, or assistant news director. The producers are not involved in the management activity contemplated by the regulations of training, supervising, disciplining, and directing and evaluating employees. The producers' primary duty is not management, but is to prepare the content and format of the newscast, and no major policy or management decisions are made by producers without obtaining permission from station management.

The directors' primary duty likewise is not management. The directors take the format generated by the producer and set the manner of presentation of the newscast. In "calling" the show, the directors merely coordinate the activities of the various technical personnel so that everyone is on the same time cue. Directors do not manage the people involved in the technical production of the newscast, but merely coordinate the technical personnel who already know the production plan. The directors' primary duty does not constitute management activity as contemplated by the regulations. Directors do not participate in management policy and strategy decisions and make no decision of significance without permission by station management.

A clearer understanding of why KDFW has failed to meet its burden of proving that directors and producers are exempt as executives can be obtained by analyzing the last element of the short test: the requirement of "customary and regular direction of the work of two or more other employees." *See id.* § 119(a). As discussed earlier, the producers do not customarily direct or supervise any employees. Each employee with whom the producers work is supervised and actually directed by station management, such as the assign-

ment manager, executive producer, and assistant news director. Although producers may certainly impact other employees' jobs, these employees report directly to persons other than the producers.

The evidence also persuades the court that directors do not in any sense supervise or assign the work performed by the various technical employees of the newscast. Each director has a supervisor who directs and assigns the director's work. The director simply coordinates technical employees, who have previously been assigned their tasks, when a particular function needs to be performed.

The producers and directors are trained and skilled employees, working under narrowly prescribed guidelines of operation with little or no discretionary power as to matters of significance or management policy. They are part of an integrated production team where each skilled employee is responsible and accountable to someone in station management. They do not qualify as bona fide executives exempt from the FLSA.

The court also finds that the assignment editors fall far short of the executive exemption, since management is clearly not their primary duty. The assignment editor's duty is to pair up reporters and photographers, monitor scanners, and review newspapers and wire copy for possible stories. Operating under well-settled guidelines, any unusual matter is immediately referred to management for decision. Their duties are certainly not the type contemplated by the regulations as management duties.

### III.

▮ The court last turns to plaintiffs' contention that defendant's violations of the FLSA were "willful" violations, covered by the three-year statute of limitations. To be a "willful" violation under the FLSA, the employer must have either known or shown reckless disregard for whether its conduct was prohibited by the FLSA. *McLaughlin v. Richland Shoe Co.,* 486 U.S. ——, 108 S.Ct. 1677, 1681, 100 L.Ed.2d

115 (1988). The Supreme Court has specifically stated that the word "willful" refers to conduct that is voluntary, deliberate, and intentional, and not merely negligent. *Id.*

In the present case, the violations of KDFW were not "willful." The questions presented as to the exemptions of the various broadcast journalism positions are apparently questions of first impression. The determinations whether reporters are artistic professionals and whether producers are administrative professionals are close ones. Moreover, in 1981 the Department of Labor notified KDFW that it approved KDFW's compensation paid to its employees and said there was no violation. KDFW's belief that the plaintiffs were exempt employees under the FLSA was not a voluntary, deliberate, and intentional attempt to violate the FLSA.

### IV.

By agreement, the parties bifurcated the liability and damages phases of this case. Accordingly, no later than December 19, 1988, the parties shall attempt to stipulate to the damages incurred by each plaintiff. Such stipulation will be without prejudice to a party's right to challenge the liability findings of the court. If the parties can so stipulate, they shall advise the court and the court will thereafter enter the appropriate judgment. If they cannot, the parties will advise the court whether discovery is necessary and when they can be prepared for a trial on the damages question.

SO ORDERED.