[No. F020310. Fifth Dist. Feb. 17, 1995.]

BRIAN E. NORDQUIST, Plaintiff and Respondent, v.
McGRAW-HILL BROADCASTING COMPANY, INC., Defendant and
Appellant.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of part 2 of Discussion.

**COUNSEL**

Payne & Fears, James L. Payne and Valerie L. McNamara for Defendant and Appellant.

Werdel & Shea and Edwin T. Shea for Plaintiff and Respondent.

**OPINION**

**THAXTER, J.**—In the published portion of this opinion we will uphold the trial court's decisions on two novel issues: (1) that plaintiff and respondent Brian E. Nordquist, a television station sports director/newscast anchor, is entitled to overtime compensation under subdivision 3 of Industrial Welfare Commission Order No. 11-80 (IWC Order No. 11-80) because he was not exempt as a professional or administrative employee, "engaged in work which is primarily intellectual, managerial, or creative," and "which requires

exercise of discretion and independent judgment" (Cal. Code Regs., tit. 8, § 11110); and (2) that Nordquist was entitled to prejudgment interest following his successful appeal to the superior court following an order by the Labor Commissioner rejecting his compensation claim.

In the unpublished portion of the opinion we will hold that the trial court erred by applying the four-year limitations period of Code of Civil Procedure section 337, subdivision 1 rather than the three-year period of section 338, subdivision (a) to Nordquist's claim. We will remand with directions to apply the correct statute of limitations and to recalculate the amount of overtime compensation and interest payable to Nordquist.

## FACTS AND PROCEDURAL HISTORY

Appellant McGraw-Hill Broadcasting Company, Inc., doing business as KERO-TV23 (KERO), hired Nordquist as a sportscaster/reporter on May 24, 1982. On August 5, 1982, Nordquist signed a written employment contract with KERO and his employment continued pursuant to successive written employment contracts until he resigned in 1987. His job responsibilities were the same before and after he signed the contract.

The three letter contracts contained similar terms, including compensation by salary and integration clauses. The contract in effect when Nordquist resigned provided:

"4.   Your basic work week will consist of five days. It is understood that from time to time you may be required to work additional days or extended workshifts.

"5.   In consideration of your duties hereunder we shall pay you, less only those deductions required by law or mutually agreed upon, a weekly gross compensation based on the following annual rates:

"(i)   From 12/30/85 through 12/28/86, $30,000 per year.

"(ii)   From 12/29/86 through 12/27/87, $33,000 per year.

"6.   Except as superseded by the terms of this agreement, you are subject to, and agree to be bound by, all of the personnel policies and benefits as outlined in the KERO-TV handbook for employees, 'McGraw-Hill Broadcasting Company and You,' and all other KERO-TV policies and procedures."

The employee handbook incorporated into the contract states a normal workweek is 40 hours and consists of five 8-hour days; payment is made for

overtime work in excess of 40 hours per week and, in California, for hours worked in excess of 8 hours per day. The handbook also states in answer to the question, "[a]re you 'exempt' or 'nonexempt'?": ". . . If you are exempt, . . . [y]ou do not record your hours worked on a time-card. [¶] If you are nonexempt, . . . you record your hours worked on a time-card" and must be paid "time and one-half your regular rate for hours worked in excess of 40 hours per week." The handbook also discusses a manager's discretion to grant compensatory time off in lieu of overtime pay.

KERO required Nordquist to keep daily and biweekly time sheets, which were approved by his supervisor, in order to receive his paycheck. According to KERO, the purpose for the time sheets for on-air employees, including Nordquist, was to keep track of vacation and sick leave days. KERO's nonexempt employees punched a time card; exempt employees used the time sheets. Since on-air employees were required to work some holidays and extra days to broadcast the daily news, KERO established an informal compensatory time-off policy. Under the policy, exempt employees were permitted to take one day off for each extra day worked, when the needs of the station would allow. The policy was discretionary with the station management, however, and frequently Nordquist was not permitted to take the promised time off.

When Nordquist was hired, he was assigned a grade level of 4009, which reflects an unclassified employee category signifying (1) Nordquist was an "on-air" employee under a "talent contract," as opposed to a staff employee; and (2) Nordquist's salary increases would not be limited by a set pay range. However, Nordquist was listed as N-E, meaning nonexempt, for Fair Labor Standards Act (FLSA) purposes on the KERO "Personnel Change Notice" form which is generated by the corporate office in New York when an employee is hired. Raymond Schiffhauer, KERO's director of business affairs, testified Nordquist's nonexempt classification resulted from a clerical error which was perpetuated by computer until he caught it in March 1987 when he was conducting a periodic review of personnel records. He admitted, however, he was aware at that time that the station manager was not entirely happy with Nordquist's performance.

In September 1983, KERO promoted Nordquist to the position of sports director/anchor. In this position, Nordquist was responsible for producing and anchoring three sports segments of KERO's live nightly newscasts, two during the hour-long 6 p.m. newscast, and one at 11 p.m., Monday through Friday. The KERO sports department had two regular employees, Nordquist and Pete Cirivilleri, the weekend news anchor. Nordquist remained the sports director/anchor until he resigned on September 4, 1987.

According to Nordquist, the sports director/anchor position involved primarily mundane and unimaginative duties and responsibilities. He gathered sports news throughout the day which he summarized, scripted, and read on-air during the sports segment of the nightly newscasts. His script was essentially a rewrite of material from wire services, satellite feeds, print media, press releases, phone calls and local interviews. Broadcast content was dictated by the sports events of the day and was prepared according to station guidelines and standard formats in the industry. On the other hand, according to KERO's news director, Walt Brown, Nordquist's duties as sports director/anchor required him to exercise discretion, judgment and creativity. Further, Nordquist's successful exercise of those traits led to his being the most watched sports anchor in the broadcast area.

On December 1, 1987, after he had resigned, Nordquist filed a claim for overtime compensation with the California Labor Commissioner pursuant to Labor Code section 98 et seq. Following an evidentiary hearing, the commissioner ruled that Nordquist was an exempt employee under IWC Order No. 11-80, and thus not entitled to overtime compensation. Nordquist sought a trial de novo in superior court. The parties stipulated to bifurcate the issues of liability and damages for trial. The trial court concluded Nordquist was a nonexempt employee entitled to overtime compensation, and the four-year statute of limitations for obligations arising from a written contract applied rather than the three-year statute of limitations for obligations arising from statute. Thus, Nordquist was entitled to overtime pay for the four-year period prior to December 1, 1987.

The parties stipulated, based on the court's ruling, that Nordquist was entitled to $102,956.14 in overtime compensation and proceeded to trial on the issue of his entitlement to prejudgment interest. The court held Nordquist was not entitled to interest under Labor Code section 98.1, subdivision (c) but was entitled to it under Civil Code section 3287. The parties then agreed Nordquist was due $60,598 in prejudgment interest and $2,512 ($31.40/day from Mar. 23, 1993, through date of judgment on June 11, 1993) in postjudgment interest. The court awarded Nordquist his costs and entered judgment accordingly. KERO's timely appeal followed.

DISCUSSION

1.  *Substantial evidence supports the finding that Nordquist was a nonexempt employee.*

*Standard of Review*

Labor Code section 98.2 provides for a de novo trial in superior court on appeal from an order by the Labor Commissioner. On appeal from

the judgment of the superior court, the findings of the Labor Commissioner are entitled to no weight, and review is of the facts presented to the trial court. (*Hernandez* v. *Mendoza* (1988) 199 Cal.App.3d 721, 725 [245 Cal.Rptr. 36].)

Whether Nordquist was exempt from the overtime provisions of IWC Order No. 11-80 is a factual issue which this court reviews under the substantial evidence rule. (*Cardenas* v. *Mission Industries* (1991) 226 Cal.App.3d 952, 958 [277 Cal.Rptr. 247].) Thus, our authority begins and ends with a determination whether, on the entire record, there is any substantial evidence—that is, of " 'ponderable legal significance,' " reasonable, credible and of solid value—contradicted or uncontradicted, which will support the judgment. As long as there is such evidence, we must affirm. (*Grappo* v. *Coventry Financial Corp.* (1991) 235 Cal.App.3d 496, 507 [286 Cal.Rptr. 714].) Moreover, when, as in this case, the evidence is in conflict, the appellate court will not disturb the findings of the trial court. The court must consider the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference and resolving conflicts in support of the judgment. (*Aceves* v. *Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 507 [156 Cal.Rptr. 41, 595 P.2d 619].)

*The Applicable Law*

The California Industrial Welfare Commission (IWC) is authorized to promulgate orders regulating wages, hours, and conditions of employment for employees throughout the state. (*Ghory* v. *Al-Lahham* (1989) 209 Cal.App.3d 1487, 1490 [257 Cal.Rptr. 924].) IWC Order No. 11-80 is the wage and hour order applicable to the broadcasting industry. The order provides, in substance, that no employee shall be employed more than eight hours in any workday or more than forty hours in any work week unless the employee receives premium pay varying from time and a half to double time, depending on the number of hours and/or days worked in excess of the stated maximums. The order applies to:

"all persons employed in the broadcasting industry whether paid on a time, piece rate, commission, or other basis, except that:

"(A) [The overtime provisions] shall not apply to persons employed in administrative, executive, or professional capacities. No person shall be considered to be employed in an administrative, executive or professional capacity unless one of the following conditions prevails:

"(1) The employee is engaged in work which is *primarily* intellectual, managerial, or creative, and which requires exercise of discretion and independent judgment, and for which the remuneration is not less than $900.00 per month; or

"(2) The employee is licensed or certified by the State of California and is engaged in the practice of one of the following recognized professions: law, medicine, dentistry, pharmacy, optometry, architecture, teaching, or accounting.

"(B) The provisions of this Order shall not apply to professional actors of either sex." (Cal. Code Regs., tit. 8, § 11110, subds. 1(A) and (B), italics added.)

Under the wage orders, an employee is "primarily" engaged in intellectual, managerial, or creative work if more than half of his or her work time is devoted to such duties. (Cal. Code Regs., tit. 8, § 11110, subd. 2(K).)

If an employee is entitled to overtime pay under California law, the employer may not abrogate its obligation to pay such compensation by written agreement. (Lab. Code, § 219.) Further, absent an explicit wage agreement, a fixed salary does not serve to compensate an employee for statutory overtime worked. (*Hernandez* v. *Mendoza, supra,* 199 Cal.App.3d at p. 725.)

Because the California wage and hour laws are modeled to some extent on federal laws, federal cases may provide persuasive guidance. (*Alcala* v. *Western Ag Enterprises* (1986) 182 Cal.App.3d 546, 550 [227 Cal.Rptr. 453].) However, California's professional employee exemption is narrower than that in the FLSA, and the administrative employee exemption is somewhat different. (2 Division of Labor Standards Enforcement, Operations and Procedures Manual (1989) §§ 10.63, 10.62 (DLSE Manual).)[1] The employer bears the burden of proving an employee is exempt. (*Corning Glass Works* v. *Brennan* (1974) 417 U.S. 188, 196-197 [41 L.Ed.2d 1, 10-11, 94 S.Ct. 2223].) Exemptions are narrowly construed against the employer and their application is limited to those employees plainly and unmistakably within their terms. (*Dalheim* v. *KDFW-TV* (5th Cir. 1990) 918 F.2d 1220, 1224.)

Regarding the artistic professional exemption, the DLSE Manual provides: "Relatively few individuals qualify for exemption as members of artistic professions in California, since most of those who have sufficient control over the nature [of] their own work and over their work hours are self-employed. Academic degrees are not required, but a specialized course of study of at least four years is generally one element involved in establishing a professional standing in the fine arts. This by itself is not enough,

---

[1]KERO submits the DLSE Manual cites should be disregarded because the sections cited are from the 1989 version, after Nordquist's employment with KERO ended. Not so; unless the manual reflects standards which changed from the time of Nordquist's employment (KERO makes no such claim), its provisions are relevant because they explain standards applicable to Nordquist's employment.

however. A composer or vocal or instrumental soloist may be exempted because of the individual's wide-ranging discretionary powers, including control over his or her working conditions, but a member of the orchestra will not be, no matter how professional a musician he or she may be. A few writers employed in the motion picture or broadcast industries have sufficient discretionary powers to be exempt, but most do not, even when they work at home, because of time limits, restricting outlines or other constraints on the creative aspects of their work. A newspaper columnist required only to furnish, for example, five columns per week, regardless of subject, time of preparation, etc., could be exempted from Order 4, but reporters, editors and advertising copy writers could not. . . ." (DLSE Manual, § 10.63.)

Regarding the administrative exception, the DLSE Manual states:

" 'Administrative capacity' is defined here and discussed . . . in accord with the general principles embodied in federal regulations, with several differences. The proportion of time that must be spent on administrative duties and the related evaluation of routine work is not the same, so employers cannot automatically rely on federal exemptions in California. . . .

"The exempt employee who works in an 'administrative capacity' is one who:

"(a) Customarily and regularly exercises discretion and independent judgment in the performance of 'intellectual' work which, in the context of an administrative function, is office or non-manual work directly related to management policies or the general business operations of the employer or the employer's customers, and

"(b)(1) regularly and directly assists a proprietor or an exempt administrator or

"(2) performs, under only general supervision, work along specialized or technical lines requiring special training, experience or knowledge, or

"(3) executes special assignments and tasks under only general supervision, and

"(c) devotes more than 50 percent of his or her work time to the activities described above . . . .

" . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Discretion and independent judgment involves the comparison and evaluation of possible courses of conduct, and acting or making a decision after considering various possibilities. It implies that the employee has the power to make an independent choice free from immediate supervision and with respect to matters of significance. The decision may be in the form of a recommendation for action subject to the final authority of a superior, but the employee must have sufficient authority for the recommendations to affect matters of consequence to the business or its customers.

"The most frequent cause of misapplication of the term 'discretion and independent judgment' is the failure to distinguish it from the use of skills and knowledge. An employee who merely applies his or her knowledge in following prescribed procedures or in determining which procedures to follow, or who determines whether specified standards are met . . . is not exercising discretion and judgment of the independent sort associated with administrative work. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"A second cause of the misapplication of the term 'discretion and independent judgment' involves employees who make decisions, but not at a level appropriate to administrative work. In some sense, almost every employee is required to use discretion: the shipping clerk may decide the method of packing, the truck driver decides the route, the bookkeeper decides which ledger to post first, but none of these decisions are important enough to count as part of an administrative function. Matters of consequence are those of real and substantial significance to the policies or general operations of the business of the employer or the employer's customers. This does not mean that exemptions are limited to persons who participate in the formulation of overall policies regarding the operation of the business as a whole—the tasks may be directly related to merely a particular segment of the business, but still must have a substantial effect on the whole business.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"The IWC orders provide that the work of the exempt administrative employee must be 'primarily' intellectual work which requires the exercise of discretion and independent judgment . . . . The intellectual work may include such activities as gathering and summarizing the information and follow-through activities which, if done separately by a nonexempt employee, might be seen as relatively routine in that it would not be related to the exercise of discretionary powers. Although such work conceivably could

be delegated, if it is an integral part of the administrative task, it may be counted as part of the exempt duties. . . ." (DLSE Manual, § 10.62.) The manual adds that persons in charge of a functional department which might even be a one-person department, such as credit managers, personnel directors, buyers, labor relations directors, may be exempt administrative employees. (*Ibid.*)

*Case Law*

There is a dearth of case law on the subject. We know of only two cases addressing in detail the issue of whether television network newswriters were exempt employees under the FLSA. Because both cases apply federal law, they are not dispositive. However, what they lack in precedential value, they make up for in the detail of their discussion.

In *Dalheim* v. *KDFW-TV* (N.D.Tex. 1988) 706 F.Supp. 493, affirmed, 918 F.2d 1220, the plaintiffs were general assignment reporters (including a sportscaster), producers, directors and assignment editors employed by KDFW-TV, a network affiliate television station. The plaintiffs contended they were required to work more than 40 hours per week without overtime pay. The defendant asserted the plaintiffs were employees working in executive, administrative or professional capacities, and therefore exempt from the FLSA provisions. The trial court concluded that KDFW-TV had failed to prove the plaintiffs were exempt. In doing so, it noted that whether an employee is exempt is a factual question, so prior decisions are of limited value because employees with the same job titles may be either exempt or nonexempt depending on their job functions. (706 F.Supp. at p. 496.)

The court set forth in detail the plaintiffs' duties at KDFW-TV. (*Dalheim* v. *KDFW-TV*, *supra*, 706 F.Supp. at pp. 496-501.) It then rejected KDFW-TV's contention that the reporter, producer and director plaintiffs were exempt as "learned" or "artistic" professionals. The court found that the station did not require plaintiffs to possess a college degree. Further, the plaintiffs tended to follow a path of starting in small markets and advancing to larger ones; their performance was enhanced by work experience which was more akin to an apprenticeship and training rather than intellectual instruction and study. (*Id.* at p. 502.)

The court acknowledged that general assignment reporters can be artistic professionals because significant technological advances in how broadcast news is gathered and presented to the viewer have required that reporters produce work that is original and creative in character and which depends primarily on the invention, imagination, or talent of the employee. (*Dalheim*

v. *KDFW-TV*, *supra*, 706 F.Supp. at p. 503.) The court concluded, however, KDFW-TV had failed to prove that the work of its reporters was "primarily" inventive or routinely original and creative. The reporters used primarily intelligence, diligence and accuracy, rather than creativity, to report facts. They were told which stories to cover and informed of the focus or angle of the story before they covered it. Occasionally, they were told who to interview. They used essentially a standard format of pictures and sound to cover most stories and attempted to obtain both sides of the story. (*Id.* at p. 505.)

The reporters were not the equivalent of a newscast announcer. KDFW-TV rarely promoted its reporters, and the evidence did not convince the court that individual reporters drew viewers in measurable numbers. (*Dalheim* v. *KDFW-TV*, *supra*, 706 F.Supp. at p. 505.) The court noted that with respect to television announcers, the determination of exempt and nonexempt status is difficult because of the merging artistic aspects of the job with the commercial. The differences that dictate whether one is a "name" announcer or a "staff" announcer are found in the announcer's personality, voice and manner and in some inherent special ability or talent which, while difficult to define, is nevertheless real. (*Dalheim* v. *KDFW-TV*, *supra*, 706 F.Supp. at p. 504.) Announcer duties which are considered exempt under federal law include: functioning as a master of ceremonies; playing parts in a program; conducting farm, fashion and home economics programs; covering public events such as sports programs, in which the announcer may be required to ad-lib and describe changing events; and acting as a narrator and commentator. Nonexempt work includes giving station identification and time signals, announcing the names of programs, and similar routine work. The determination whether a particular announcer is exempt thus is based upon his individual duties and the amount of exempt and nonexempt work performed. (*Dalheim* v. *KDFW-TV*, *supra*, 706 F.Supp. at p. 504.)

The court found the KDFW-TV producers were not artistic professionals because their work was akin to that of the "rewrite man." They usually revised work prepared by reporters, wire services, or earlier broadcast news stories. Thus, their work was not creative or original. Further, in formatting a newscast, the producers followed accepted conventions in selecting lead stories, grouping related stories, pacing the broadcast, avoiding monotony in sequencing forms of stories, and in incorporating stories that could be added or dropped as time dictated. (*Dalheim* v. *KDFW-TV*, *supra*, 706 F.Supp. at p. 506.)

In the same vein, the directors were not artistic professionals because they operated principally within accepted guidelines rather than relying on invention, imagination or talent in performing their job. Many of their decisions

were obvious because station management had prescribed the "look" of the newscast in much detail. (*Dalheim* v. *KDFW-TV*, *supra*, 706 F.Supp. at p. 506.)

The *Dalheim* court also concluded the producers, directors and assignment editors did not qualify as exempt administrative employees. They did not perform work related to administration as distinguished from production. In addition, the producers used techniques, procedures, repetitious experiences and specific standards to carry out their work. The length of their stories was dictated by station management and the relative importance of the story. Industry standards dictated how to lead a newscast, group and bridge stories, and when and how to cut stories. Producers merely utilized their knowledge in following these prescribed procedures. (*Dalheim* v. *KDFW-TV*, *supra*, 706 F.Supp. at pp. 507-508.) Likewise, the directors merely employed skill in applying techniques and procedures to their tasks; they did not employ discretion and independent judgment. (*Id.* at p. 508.)

Several years later, another group of television network newscast employees brought suit for overtime compensation in *Freeman* v. *National Broadcasting Co., Inc.* (S.D.N.Y. 1993) 846 F.Supp. 1109 with similar results. There, the newswriter for "NBC Nightly News," the news producer for NBC's "Today" show and "Weekend Nightly News," and a field producer/newswriter sought overtime pay from their employer, NBC. The trial court, in a 51-page opinion, concluded plaintiffs were not administrative or artistic professional employees under the FLSA.

The plaintiffs' work related essentially to producing the primary product of a broadcast news organization—a news program—rather than to defendant's administrative operations. Plaintiffs' duties and responsibilities did not include administrative tasks such as setting business policy, planning the news division's long-range objectives, promoting the newscast, or negotiating salary or benefits with other personnel. (*Freeman* v. *National Broadcasting Co., Inc.*, *supra*, 846 F.Supp. at p. 1153.)

Further, the NBC employees were not exempt artistic professionals. The court concluded that the reporting of news, the rewriting of stories received from various sources, and the routine editorial work of a reporter was not predominantly original and creative in character. Under the federal guidelines, only analytical, interpretive or highly individualized writing is considered creative. Thus, collecting facts about news events by investigation, interview or personal observation and then writing stories for publication about these events was nonexempt work. (*Freeman* v. *National Broadcasting Co., Inc.*, *supra*, 846 F.Supp. at p. 1156.)

The court rejected NBC's argument that plaintiffs' primary duty was to develop and create engaging and interesting news stories, which require judgment, selectivity, creativity and a high degree of talent. NBC had argued that the employees must analyze substantial amounts of complex information received from a variety of sources, including original sources; each must interpret that material to give it meaning for NBC viewers; each is compelled to make a number of difficult choices about what to include and how to express it in the most engaging manner possible; and each must individualize his treatment of such material in the course of creating a visual news story expected to have flair, vitality and distinctiveness. (*Freeman* v. *National Broadcasting Co., Inc.*, supra, 846 F.Supp. at p. 1156.) The court noted all nonfiction writing requires the writer to select and impose a structure on facts. Moreover, virtually all journalistic writing is designed to some extent to interest, engage and entertain, as well as to inform the reader or viewer. The question, therefore, was whether the character of plaintiffs' work as a whole was defined to the same extent by invention, imagination and talent, as those employees generally defined as exempt by the federal regulations: editorial writers, columnists, critics, and "top flight" writers of analytical and interpretive articles. (*Id.* at pp. 1156-1157.)

The *Freeman* court concluded the plaintiffs were "talented" in the sense that they had a native and superior ability in their fields. On occasion, their work was inventive and imaginative and rose to the level of artistry. In some respects, their work was also analytical. However, their work was predominantly functional in nature, in that it depended on acquired skill and experience. It did not depend to a sufficient extent on invention, imagination or talent to qualify for the artistic professional exemption. (*Freeman* v. *National Broadcasting Co., Inc.*, supra, 846 F.Supp. at p. 1157.)

The court was not convinced that the added element in television journalism of combining words and pictures required a significantly greater amount of invention, imagination, or talent. There was an element of creativity involved in integrating words and pictures, just as there was an element of creativity in choosing the words and structure of a written script. However, the evidence disclosed that editing words and pictures or "writing to picture" was largely an acquired skill. Finally, the time constraints under which plaintiffs worked frequently served to limit opportunities for creativity and invention. (*Freeman* v. *National Broadcasting Co., Inc.*, supra, 846 F.Supp. at p. 1157.)

Other factors that influenced the court's decision included that plaintiffs' writing was fundamentally objective reporting of the news, and they relied

primarily on their intelligence and the skills derived from many years of experience in the field and not imagination or sheer talent. (*Freeman* v. *National Broadcasting Co., Inc., supra*, 846 F.Supp. at p. 1158.) Further, like all reporters, they made decisions and judgment in the field regarding what to film and whom to interview. The decisions, however, were frequently dictated by the nature of the assignment and a standard format for pictures and sound. (*Id.* at p. 1159.)

The court held, although plaintiffs performed work that was at times original, creative, or analytic, their usual daily tasks involved acquired skill and experience rather than invention, imagination or sheer talent. Thus, they were nonexempt employees entitled to overtime compensation. (*Freeman* v. *National Broadcasting Co., Inc., supra*, 846 F.Supp. at p. 1159.)

A third case cited by KERO, *Mandelaris* v. *McGraw-Hill Broadcasting Co.* (E.D.Cal. 1992), involves a claim for overtime compensation by Nordquist's successor at KERO. In the unpublished opinion that includes only findings of fact and conclusions of law, the court held that Mandelaris, as KERO's sports director/anchor, was an exempt artistic professional and administrative employee within the meaning of IWC Order No. 11-80. The conclusion was based on findings that: Mandelaris had discretion to decide whether he or Pete Cirivilleri, the weekend sports anchor, covered selected sporting events; when and if a story should be abandoned; the order of presentation of stories on a newscast and the tone of the story aired. In addition, Mandelaris was his own editor and he ad-libbed as necessary and demonstrated talent in being able to perform on television and at public events extemporaneously. Further, Mandelaris spent more than 50 percent of his working time performing tasks which required the exercise of discretion and independent judgment; he engaged in work which was primarily intellectual and creative; there were no evident constraints on the creative aspects of his work and he performed his duties under only general supervision. (*Ibid.*)

*Mandelaris* is not dispositive here because the decision is fact specific. Even if the evidence in the two cases were identical, the decision by one fact finder does not preclude a contrary finding by another fact finder.

*Nordquist's Job Responsibilities*

*Testimony of KERO's Walt Brown*

Walt Brown, KERO's news director and Nordquist's supervisor, described Nordquist's job responsibilities as sports director and nightly sports anchor.

Nordquist gathered information, served as assignment editor for the sports department, and was writer, editor and producer of his sports newscast. He supervised or shot his own video and designed graphics for his segments within format guidelines. Nordquist determined the content for each newscast and was only required to clear stories with potential legal consequences. According to Brown, the greatest bulk of Nordquist's time was spent in absorbing the great body of sports material that is available on any given day and collating it in order to write the newscast.

Nordquist determined which of the myriad sporting events that day would be included in the sports segment and had complete discretion as to who to interview for a story. Brown indicated Nordquist's discretion was somewhat limited by a station policy to lead with local sports whenever feasible. Nordquist was a talented and creative video editor whose skills in this regard kept the viewers entertained. The pacing of Nordquist's sportscasts distinguished him from other sports anchors. In addition, Nordquist possessed a special quality or charisma that drew people to him, which KERO looked for in its on-air personnel. He was able to ad-lib when necessary.

Nordquist set himself apart from other local sportscasters by his prime time specials, such as "Grow for the Gold." Nordquist displayed originality, creativity, discretion and judgment in these programs, which appealed to a wider audience than the usual nightly sports news. In preparing these programs, Nordquist would gather information, "negotiate" a photographer, coordinate interviews, film, "write to the video," determine whether to use archive materials, and edit the program to ensure good pacing and that it fit the time framework.

Brown testified he provided "light" supervision for Nordquist. The guidelines he provided were ad hoc rather than from a prepared list. He gave the sports reporters autonomy to schedule themselves so long as they got the job done. He made content suggestions to Nordquist every two or three weeks.

### Nordquist's Testimony

Nordquist has a ninth grade education and his only formal training in the broadcasting industry was two months at the National Institute of Broadcasting School, which provided voice training. He had 10 years of experience in radio sports before coming to KERO.

As anchor for the sports segment of the weekday nightly newscasts, Nordquist was on-air for approximately 10 minutes total. The station ran two three-and-one-third-minute sports segments at the hour-long 6 p.m. program

and one three-and-one-third-minute segment during the half-hour 11 p.m. newscast. Nordquist wrote his own scripts. The sports stories of the day dictated the content of the scripts. When Nordquist arrived at KERO each morning, he gathered sports information from various sources: the Associated Press wire copy; satellite feeds; national, state and local newspapers; sports magazines; press releases and information he received over the telephone. He prioritized content with the aid of the wire service that stacked stories by priority. He also relied on station guidelines or requirements of the news director that his segments lead with a local story and the story with the most recent video.

Nordquist decided which stories to cover each day and how to present them pursuant to the guidelines of his news director. The guidelines included format standards, e.g., sound bites should be no longer than 45 to 50 seconds and should be run with action video rather than a tape of the person interviewed to avoid "talking heads." Whom he interviewed was determined by certain sports industry standards: unbeaten teams, higher ranked teams, geographically proximate teams, etc. Nordquist was directed to report the facts; it was contrary to KERO's policy for him to editorialize.

Nordquist tended to "lift" stories word-for-word from the wire service. The great majority of the material in his scripts came from another written source. In addition, he edited satellite feed tapes for video to accompany his scripts. The editing techniques he utilized were common industry-wide rather than unique to him. In addition, Brown required he use certain formats, such as always displaying the home team on the bottom of the scoreboard screen regardless of which team won. Nordquist seldom deviated from the script which he simply read from the TelePrompTer. Occasionally, he ad-libbed coming on or off his segment or when directed to "stretch" his segment by the producer. However, he and his co-anchor usually agreed on the transitional ad libs before the broadcast. During his broadcast segment, the director instructed him through an earpiece he wore.

Although no one edited Nordquist's scripts, Nordquist discussed the content of his segments with Walt Brown almost daily. Brown provided almost daily critique and made frequent content suggestions. Brown suggested the story line for many of Nordquist's specials and series. For example, for the award winning "Grow for the Gold" series, Brown asked Nordquist to do a four-part series on anabolic steroids, particularly the human growth hormone, with a local angle. Brown directed Nordquist to include basic information, controversies, expert commentary and interviews with local bodybuilders. Nordquist testified these specials generally required about two and a half to three days to prepare.

KERO required Nordquist to attend promotional events and make personal appearances for the station 10 to 12 times a year. Personal appearance requests usually came through the news director or the station manager. KERO promoted Nordquist and the other news anchors through the print media. While Nordquist was the weekday sports anchor, KERO news and its news team was rated number one in the Bakersfield market. Nordquist won numerous awards for his sports broadcasts.

### Testimony of Pete Cirivilleri

Walt Brown hired Cirivilleri as weekend sports anchor in 1983. Nordquist was not involved in the hiring interview. Cirivilleri viewed Nordquist as an associate rather than a supervisor. He saw the sports department as a two-man team.

When Nordquist left KERO, Cirivilleri became the sports director/weekday news anchor. As sports director, he took it upon himself to do a little more organization of the stories. He had daily or weekly supervision from Brown.

*There was substantial evidence Nordquist was not required to perform work which was primarily intellectual and creative and which required the exercise of discretion and independent judgment.*

█ On our review of the entire record we conclude there is substantial evidence supporting the trial court's conclusion that Nordquist was a non-exempt employee.

KERO did not establish as a matter of law that Nordquist fell within the artistic professional exemption. First, Nordquist had no advanced degree or even a high school education. The skill and expertise he developed over the years came from on-the-job training. Although as a successful sports anchor he displayed a certain amount of originality and creativity in his ability to present the sports news, the majority of his job responsibilities were more mundane and routine, like those of the plaintiffs in *Dalheim* and *Freeman*. He gathered sports information from various sources—written and video—and generated some local stories himself. However, he was directed to simply report the facts and was precluded from providing commentary on stories he reported. Nordquist summarized, prioritized and produced the reports largely within station and industry formats. During the approximately 10 to 11 minutes he was on the air each weekday, he read from a Tele-PrompTer and seldom deviated from the prepared script. This evidence supports the trial court's conclusion that Nordquist's job responsibilities

were not primarily intellectual or creative within the meaning of IWC Order No. 11-80.

About four times a year, Nordquist prepared sports related specials or series which displayed originality and creativity and involved independent judgment. However, Nordquist testified these specials required only two and a half to three days each to prepare.[2] Thus, even if they did involve the creativity and discretion necessary to make those tasks exempt, they did not consume 50 percent of his work time.

Substantial evidence also supports the court's conclusion Nordquist was not exempt as an administrative employee. As pertinent to the facts of this case, the DLSE Manual section 10.62 provides that the exempt employee who works in an administrative capacity is one who (1) regularly exercises discretion and independent judgment in the performance of "intellectual" work which is directly related to management policies or the general business operations of the employer, and (2) performs work, under only general supervision, along specialized or technical lines requiring special training, experience or knowledge.

"Discretion and independent judgment" within the meaning of IWC Order No. 11-80 involves the comparison of possible courses of conduct, and acting after considering various possibilities. It implies that the employee has the power to make an independent choice free from immediate supervision and with respect to matters of significance. The decisions must be at a level appropriate to administrative work. Matters of consequence are those of substantial significance to the policies or general operations of the business of the employer. (DLSE Manual, § 10.62.)

We need not determine whether decisions regarding the content and presentation of the nightly sports newscast constitute matters of significance to the business of KERO, because the evidence supports the conclusion that Nordquist's duties did not involve the "discretion and independent judgment" contemplated by the administrative employee exemption. The DLSE Manual provides that the use of "discretion and independent judgment" are distinguishable from the use of skills and knowledge. An employee who merely applies his knowledge in following prescribed procedures is not exercising discretion and judgment of the independent sort associated with administrative work. (DLSE Manual, § 10.62.)

---

[2] Although KERO argues that Nordquist's testimony regarding the amount of time involved in preparation of the specials is inherently improbable, without expert testimony on the subject we are in no position to discount his testimony.

The *Freeman* court focused on this difference in concluding that, although talented, the news reporters, producers and editors were not exempt employees because they generated work which depended primarily on skill and experience rather than creativity or sheer talent. (*Freeman* v. *National Broadcasting Co., Inc., supra,* 846 F.Supp. at p. 1157.) Likewise, Nordquist's "talent" for putting together an entertaining sports newscast came from his skillful application of station guidelines and various techniques which were standard in the industry.

Accordingly, substantial evidence supports the trial court's finding that Nordquist was not an exempt employee within the meaning of IWC Order No. 11-80. The court's conclusion is bolstered by the fact that KERO categorized Nordquist as a nonexempt employee on its personnel records between 1982 and 1987 and required him to fill in time sheets, which the employee handbook indicated made him a nonexempt employee. While KERO claimed that Nordquist's original classification resulted from a clerical error, and the purpose of the time sheet was merely to track sick leave and vacation time, the fact finder was free to draw contrary inferences.

2.   *The court erred in applying the four-year limitations period of Code of Civil Procedure section 337, subdivision 1 rather than the three-year period of Code of Civil Procedure section 338, subdivision (a).*\*

. . . . . . . . . . . . . . . . . . . . . . . . . .

3.   *The trial court properly awarded Nordquist prejudgment interest pursuant to Civil Code section 3287.*

█   The trial court concluded Nordquist was not entitled to prejudgment interest under Labor Code section 98.1, subdivision (c) (hereafter § 98.1(c)), which provides for interest on awards granted by the Labor Commissioner, but it awarded interest pursuant to Civil Code section 3287, which provides generally for the award of interest on damages. KERO contends Nordquist is not entitled to any prejudgment interest because he did not prevail in the administrative proceeding. KERO reasons that because Nordquist is not entitled to interest under the statute that specifically governs his claim, he should not be entitled to interest under Civil Code section 3287's general grant of interest.

Section 98.1(c) provides, "All awards granted pursuant to a hearing under this chapter [the administrative proceeding before the Labor Commissioner]

---

\*See footnote, *ante,* page 555.

shall accrue interest on all due and unpaid wages at the adjusted annual rate established pursuant to Section 19269 [now section 19521] of the Revenue and Taxation Code. The interest shall run until the wages are paid from the date that the wages were due and payable . . . ." There is no dispute that Nordquist was not awarded compensation in the administrative proceeding, so is not entitled to interest under section 98.1(c).

The question remains whether the court should infer from section 98.1(c) a legislative intent or determination that interest awardable under Civil Code section 3287 is not available to claimants who are unsuccessful in the administrative proceeding but who prevail on appeal in a judicial trial de novo.

Nordquist relies on a line of cases holding that the Legislature's failure to expressly provide for interest on retroactive government benefit awards did not prevent the recipient from recovering interest under Civil Code section 3287, subdivision (a).[3] (*Tripp* v. *Swoap* (1976) 17 Cal.3d 671, 681 [131 Cal.Rptr. 789, 552 P.2d 749] [welfare benefits]; *Austin* v. *Board of Retirement* (1989) 209 Cal.App.3d 1528, 1532-1534 [258 Cal.Rptr. 106] [disability retirement benefits]; *Aguilar* v. *Unemployment Ins. Appeals Bd.* (1990) 223 Cal.App.3d 239, 245 [272 Cal.Rptr. 696] [unemployment benefits].) In each of these cases, the court found nothing in the statutory scheme governing the particular benefit which suggested a legislative intent to preclude recovery of interest on damages awarded as prejudgment benefits from the date such benefits became due. (See *id.* at pp. 243, 245.)

In this case, the statutory scheme governing employee compensation claims expressly awards prejudgment interest to claimants who prevail in the administrative proceeding. The purpose of Labor Code section 98 et seq. is to afford a speedy method by which wage earners may determine their right to wages, while at the same time affording due process to employers and a procedure for appeal. (*Dawson* v. *Westerly Investigations, Inc.* (1988) 204 Cal.App.3d Supp. 20, 24 [251 Cal.Rptr. 633].) As a corollary to this purpose, the Legislature provided disincentives to discourage meritless and unwarranted appeals. For example, Labor Code section 98.2, subdivision (b) makes unsuccessful appellants liable for costs and attorney fees but does not award costs and fees to successful appellants. (*Henry* v. *Amrol, Inc.* (1990) 222 Cal.App.3d Supp. 1, 7-8 [272 Cal.Rptr. 134].) According to KERO, the same purpose is served by subjecting an unsuccessful employer-appellant to

---

[3]Civil Code section 3287, subdivision (a) authorizes the recovery of interest on damages which are certain or capable of being made certain by calculation, if the right to recover has vested on a particular day.

an assessment of prejudgment interest, but relieving the employer from an interest award when the commissioner accepted the employer's justification for denying the employee's claim. In other words, KERO contends the Legislature sought to discourage appeals by employees by denying interest even if the appeal has merit.

KERO's argument fails to acknowledge the difference in the rate of interest under each statute. It appears that section 98.1(c)'s "adjusted annual rate," is substantially more generous than the fixed rate provided by Civil Code section 3287. The parties stipulated that if the court awarded Nordquist interest pursuant to section 98.1(c), the amount of such interest through December 1992 was $113,070.41. If the court awarded interest pursuant to Civil Code section 3287, the amount of interest through March 23, 1993, was only $60,598. Because the interest rates vary substantially, application of the pertinent interest statute in the applicable case both (1) effectuates the legislative purpose of discouraging meritless appeals (the employer who appeals an administrative award to the employee would pay the higher interest rate) and (2) protects the right of the damaged, but originally unsuccessful, employee to fully recoup his losses from the employer's erroneous denial of wages.

KERO makes two additional arguments to support its position. First, it asserts section 98.1(c) is rendered a nullity if every wage claimant who prevails in court is entitled to interest under Civil Code section 3287, subdivision (a), regardless of his or her success before the commissioner. KERO relies on the rule of statutory construction that an interpretation which would render terms surplusage should be avoided. (*City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 54 [184 Cal.Rptr. 713, 648 P.2d 935].) However, as discussed above, an award of interest under Civil Code section 3287 when the originally unsuccessful employee prevails on appeal does not render section 98.1(c) without effect. That section provides a more generous award to the employee who also prevails in the administrative proceeding.

Finally, KERO cites the rule that a specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to include the subject to which the particular provision relates. (*Krieger* v. *Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 214 [285 Cal.Rptr. 717]; Code Civ. Proc., § 1859.) KERO contends section 98.1(c) is the specific provision governing the award of interest on employee wage claim awards and as such, it prevails over the general provision for interest in Civil Code section 3287.

The rule upon which KERO relies, however, applies only when the two statutes conflict. (*State Farm Mut. Auto. Ins. Co.* v. *Haight* (1988) 205 Cal.App.3d 223, 239 [252 Cal.Rptr. 162].) Here, although both statutes address prejudgment interest, they are not mutually exclusive. Section 98.1(c) can be applied to cases in which the employee prevails both before the commissioner and in the de novo judicial proceeding, while Civil Code section 3287 can be applied to cases in which the employee prevails only in court. Such interpretation is not unreasonable and does not violate the express provisions of either statute.

KERO also argues that Nordquist was responsible for the prejudgment delay so interest should not be awarded. That argument was made and rejected in the trial court. KERO has not shown any error or abuse of discretion in the court's ruling. Accordingly, the award of interest under Civil Code section 3287 should be affirmed.

### DISPOSITION

The judgment is reversed insofar as it applies the four-year period of limitations under Code of Civil Procedure section 337, subdivision 1, and is affirmed in all other respects. The matter is remanded with directions to apply the three-year period of limitations of Code of Civil Procedure section 338, subdivision (a), and to conduct such further proceedings as may be necessary to redetermine the amounts of overtime compensation and prejudgment interest payable to respondent.

Each party shall bear its own costs on appeal.

Stone (W. A.), Acting P. J., and Dibiaso, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 11, 1995.